## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| ALEX DELGADO, ) | |
|   Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 04-30124-MAP |
| ) | |
| KATHLEEN M. DENNEHY, ) | |
|   COMMISSIONER OF CORRECTION, ) | |
|   Respondent. ) | |
| _____ ) | |

### RESPONDENT'S MEMORANDUM
### IN SUPPORT OF MOTION TO DISMISS

The respondent submits this memorandum in support of her motion to dismiss the petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by Alex Delgado, "the petitioner," who seeks federal court relief based on five grounds of alleged constitutional error:

(1) denial of the right to impartial jury representing a fair cross section of the community from which his jury was selected;

(2) right to equal protection, due process, access to courts was violated by (a) state's failure to collect racial/ethnic data; (b) denial of information/finances to obtain information; (c) state refused to accept substantial preliminary data as reliable for purpose of ruling on motion for discovery and financial assistance;

(3) jury instructions violated right to due process of law;

(4) prosecution withheld actual terms and conditions of Maria Mercado's cooperation agreement from defense and misrepresented agreement to jury;

(5) ineffective assistance to trial attorney for failing to document fair cross section challenge to jury composition or request funds to fully investigate claim; failing to timely object to jury instruction and failing to request a cautionary instruction warning jury to closely scrutinize Mercado's testimony. (Petition, Addendum C at 1-6).

2

The petition was filed on June 30, 2004, and the respondent filed an answer on September 15, 2004, which alleged as defenses that the state court adjudication of the petitioner's claims did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States as required by 28 U.S.C. §2254(d)(1); that the petition contained issues of state law not cognizable on federal habeas review; that the petitioner has procedurally defaulted on one or more claims, and that the petition failed to state a claim upon which habeas corpus relief can be granted. (Answer at 2).

On June 5, 2002, this Court issued a Scheduling Order, ordering the respondent to file a dispositive motion with regard to any defenses to the petition with supporting memorandum. (Civil Docket For Case 03-30124-MAP # 23). Today, the respondent filed a motion to dismiss the petition for failure to state a claim upon which habeas corpus relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) and herein submits a supporting memorandum in compliance with the Scheduling Order.

The petition should be dismissed for several reasons. The petitioner has failed to prove that the Supreme Judicial Court (SJC)'s rejection of Ground One--that he was denied the right to an jury which represented a fair cross section of the community as guaranteed by the Sixth Amendment to the United States Constitution-- was contrary to or an unreasonable application of *Taylor v. Louisiana*, 419 U.S. 522 (1975) and *Duren v. Missouri*, 439 U.S. 357 (1979). *See Commonwealth v. Arriaga*, 438 Mass. 556, 781 N.E. 2d 1253 ( 2003). In *Taylor* and *Duren*, the Supreme Court established the benchmark for Sixth Amendment "fair cross section" federal constitutional claims filed by defendants who

3

challenge the composition of the juries that convicted them and the SJC's thoughtful, well-

reasoned decision in the petitioner's case truly reflected the court's holdings. *See*

*Commonwealth v. Arriaga*, 438 Mass. 556, 561-568, 781 N.E. 2d 1253 (2003)(Exh. 7).

In Ground Two, the petitioner claims that his constitutional rights were violated

because the state failed to collect racial and ethnic data in connection with jury selection;

that he was denied information and finances to obtain such information and that the state

refused to accept substantial preliminary data as reliable for purpose of ruling on his

motion for discovery and financial assistance. (Petition, Addendum C at 1-2). Although the

petitioner couches this ground in federal constitutional garb, stripped of this gloss the

claim is simply one of state law and whether the motion judge abused her discretion in

denying post-trial discovery. His post- trial motions for funds to engage an expert and for

discovery were filed pursuant to G. L. c. 261, § 27C in connection with a motion for a  new

trial and were denied.  The SJC found that there was no abuse of discretion in denying the

motions since funds are not generally available under state law for defendants seeking post-

trial relief and the petitioner had failed to make a prima facie showing that relief could be

granted.  *See Arriaga*, 438 Mass. at 569-570.

Ground Three alleging error in the judge's jury instructions is a procedurally

defaulted claim since the SJC found that there was no objection to the instructions.

*Arriaga*, 438 Mass. at 573. The court did review the charge but only to determine whether

there was error, and if so, whether the error created a substantial likelihood of a

miscarriage of justice.  Under settled Supreme Court and First Circuit precedents, this

claim is not reviewable by a federal habeas court absent a showing of cause and prejudice

4

or proof of actual innocence. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

In Ground Four, the petitioner asserts that the prosecution withheld the actual terms and conditions of Maria Mercado's cooperation agreement from the defense and misrepresented the agreement to the jury in violation of his right to due process of law and confrontation of witnesses. (Addendum C at 3-6). In her Consolidated Memorandum of Decision and Order Denying Defendants' Motions for a New Trial, the motion judge, Sweeney, J., who was also the trial judge, dismissed this claim, stating that "there was nothing in the record that would in anyway reasonably support such a grave accusation." (Supp. Ans. Exh. 5 at Add. 57-98). This presumptively correct finding of fact made by the motion judge was adopted by the SJC which rejected the claim "for the same reasons as the motion judge; they are without merit." *Arriaga*, 435 Mass. at 581. Its adjudication is not contrary or nor an unreasonably application of *Giglio v. United States*, 405 U.S. 150 (1972).

In Ground Five, the petitioner asserts a catchall ineffective assistance of counsel, reasserting previously claimed errors as attorney missteps. This ineffective claim was summarily dismissed by the SJC and its adjudication was not contrary to *Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner had claimed that his trial attorney failed to file a fully-documented fair cross section challenge to the jury composition; failed to timely object to the jury instructions; and failed to request a cautionary instruction warning the jury to closely scrutinize Mercado's testimony. (Petition, Addendum C at 6-7). The SJC concluded that little was offered in support of these contentions. " *Arriaga*, 328 Mass. at 583.

5

## PRIOR PROCEEDINGS [1]

On October 2, 1992, the Hampden County Grand Jury indicted Hector Arriaga (Arriaga) on one count of first degree murder and one count of conspiracy to commit murder in connection with the September 13, 1992 death of Arnaldo Esteras.  On January 19, 1993, the  Hampden County Grand Jury indicted the petitioner, Alex Delgado (Delgado), as an accessory before the fact to first degree murder in connection with the death of Esteras.  Thereafter, upon the Commonwealth's motion, the indictments against Arriaga and Delgado were joined for trial.   Arriaga was represented by Attorney Greg T. Schubert, while Delgado was represented by Attorney David Hoose.

Prior to trial, the defendants moved for a change of venue based on the extensive pretrial publicity regarding these cases, as well as heightened tension among residents in the Springfield/Hartford area concerning "gang" violence.  In lieu of a change of venue and with the consent of the defendants, the trial judge impaneled the jury in Essex County and conducted the trial in Hampden County.  The defendants suggested Essex County as an appropriate locus from which to choose the trial jurors.  This request and the trial judge's acceptance of it were, in part, based on the defendants' pre-trial representations that the percentage of citizens of Hispanic origin or heritage in Essex County was comparable to that of Hampden County.

---

[1] This section is derived from the Consolidated Memorandum of Decision and Order Denying Defendants' Motions for a New Trial, Procedural Background, issued on September 7, 1999, by Judge Constance M. Sweeney.  (Supplemental Answer, Exh. 5, Add. 58-61). The case citations have been omitted.

6

Jury selection occurred from September 7 through September 10, 1993, in Lawrence.  Some 350 prospective jurors were summoned on the first two days of the impanelment, with between 70 and 90% actually appearing.  Given the large number of prospective jurors excluded for cause during the first two days of impanelment, the Jury Commissioner tripled the size of the jury pool by ordering the panels from Salem and Newburyport to report to Lawrence for the final two days.   Following four days of selection, a jury of sixteen was selected and impaneled in Lawrence and then brought to Springfield for the trial.  The jury was sequestered throughout the trial.

Before the jury was sworn, each defendant moved to discharge the jury pursuant to Mass. R. Crim. P. 20(a) on the ground that the venires from which the jury was selected did not represent a fair cross-section of the ethnic composition of either Hampden or Essex County.  Delgado's motion was supported by the affidavit of Attorney Hoose stating that he personally observed the jury venires and saw only two or three Hispanics, one African-American, and five to seven Asian-Americans in the entire array.  The affidavit further stated that according to the 1990 Federal Census, 10.4% of the Essex County population was "Hispanic/Non-White."[2] Arriaga's motion was supported by attorney Schubert's affidavit stating that the array had only a 1/3 response rate to the jury summons, the array for Salem was never sent to Lawrence Superior Court, and the array was limited in its composition to one or two persons of Latino descent.

---

[2] In support of the motion to discharge the jury, the defendants submitted Table 10 from the U.S. Department of Commerce Bureau of the Census showing that the 1990 population of Essex County was 7.3% Hispanic.

7

Since, under Massachusetts caselaw, defense counsel's identification of members of a particular race or ethnicity through visual observation is not reliable evidence of the true makeup of a venire, the trial judge denied the defendants' motions to discharge the jury on September 10, 1993.

Following a trial in Hampden Superior Court from September 13 to September 20, the jury convicted Arriaga of first degree murder and convicted the petitioner Delgado of being an accessory before the fact to first degree murder.  Represented by new counsel, the defendants appealed to the Supreme Judicial Court from their respective convictions. Along with the claims of appeal, the defendants filed motions for new trial with the high court, which remanded the motions to the trial court for decision.

On September 16, 1995, both defendants filed motions with the Supreme Judicial Court seeking an order directing the Jury Commissioner to release juror records relating to the selection and attendance of grand and petit jurors in Essex County during specified periods.  In addition, both defendants filed motions seeking funds to retain a statistician and a linguist to review said jury records to determine whether Hispanic residents were underrepresented in the jury venires in both Hampden and Essex Counties.  A Single Justice (Greaney, J.) denied the motions with respect to the grand jury and remanded the motions to the trial court with respect to the petit jury.

Following a hearing, the trial court denied the motions for funds as well as a subsequent motion for reconsideration.  A single justice of the Appeals Court (Jacobs, J.) affirmed these rulings on July 6, 1996. The defendants filed additional motions for discovery, which were denied and motions for expenses, some of which were allowed.   The

8

petitioner Delgado continued to amend and supplement his motion for a new trial by

asserting new grounds for relief.

On September 7, 1999, the trial court denied the defendants' motions for a new trial

in her Consolidated Memorandum of Decision and Order Denying Defendants' Motions

for a New Trial (Supp. Ans. Exh. 5 at Add. 57-94) and the defendants appealed.  On

January 27, 2003, the SJC affirmed the judgments of conviction and orders denying post-

trial motions.  *Commonwealth v. Arriaga*, 438 Mass. 556, 781 N.E. 2d 1253 (2003)(Exh. 7).

The instant petition for habeas corpus relief was filed on June  30, 2004.

## STATEMENT OF FACTS

The Supreme Judicial Court summarized the facts of the underlying crimes for

which the petitioner was convicted as follows:

> The victim (Arnaldo Esteras), Carlos Rodriguez, and Carlos Cruz were standing on the corner of Main and Sheldon Streets in Springfield on the early afternoon of September 13, 1992, when Ismael Cintron walked by on his way to a grocery store.  Cintron was wearing his "Latin Kings" beads and the victim told him to "[t]ake off the mother fucking beads or tuck them in your jacket."  Rodriguez threatened to give Cintron an "ass whipping" if he did not remove the beads.  When Cintron emerged from the market his beads were no longer visible.

> Cintron viewed the insult to his beads as publicly humiliating and requiring retaliation to "regain respect" on the street.  He went to the local Latin Kings headquarters and "reported the incident."  Members of the gang (including Delgado, the vice-president) decided that, in response, Esteras should be "terminated."  They armed Cintron with a gun and Arriaga with a folding knife, and dispatched them on their "mission," clad in dark hooded sweatshirts.  As they approached Esteras, still in the company of friends on Main Street, Cintron decided he could not shoot the victim.  Arriaga took the gun from him and gave him the knife.

> At approximately 9:15 P.M., Arriaga shot Esteras in the chest from a distance of about four feet.  Esteras, who had been sitting on the hood of a car, rolled off and began to run, but tripped and fell.  Arriaga pursued him, still firing.

9

The victim suffered two gunshot wounds to the head and one to his chest; he died in the emergency room of a Springfield hospital at about 9:30 P.M.

As Cintron and Arriaga returned to the getaway car, Arriaga handed the gun back to Cintron. Cintron emptied the spent shells and wiped the gun clean of fingerprints while Cruz Gonzalez, the driver, headed toward Connecticut. In Hartford, Arriaga and Cintron cleaned any fingerprints from the car and removed a stolen registration plate that they discarded with their hooded sweatshirts. They buried the gun in a Hartford park.

Shortly after the shooting, Sergeant Kevin Devine of the Springfield police department interviewed several witnesses. He took them to the detective bureau and showed them mugshots to see if they could identify "Quest" (Cintron's street name). When Cintron was identified in the early hours of September 14, the police set out for three locations, including the Latin Kings headquarters (an apartment at 95 Bancroft Street), where they found a black jacket bearing the name "Quest" and Arriaga's wallet.

Within several hours of their return to Springfield both Gonzalez and Cintron were arrested. Delgado was taken into custody by Amherst police on September 14. On September 15, Gonzalez accompanied Springfield police to Hartford and assisted in the recovery of the stolen registration plate, the sweatshirts, and the gun. Delgado's fingerprint was found on the registration plate. Arriaga voluntarily surrendered to police on September 25 and was interrogated by Sergeant Devine. He initially denied any involvement in the victim's death or any affiliation with the Latin Kings. After Devine read from statements obtained from Cintron and Gonzalez, Arriaga admitted that he had lied. He then described what he characterized as his and Cintron's attempted robbery of the victim to obtain marijuana. When gunfire erupted, he ran from the scene and persuaded Gonzalez to drive to Hartford, where he helped in hiding the registration plate and the sweatshirts.

*Arriaga*, 438 Mass. at 559-561.

## STANDARD OF REVIEW

Because the petition for writ of habeas corpus was filed after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), this Court's review of the petitioner's claims is governed by that statute. *Lindh v. Murphy,* 521 U.S. 320, 336 (1997). The relevant statutory provision, 28 U.S.C. § 2254(d)(1), states:

10

**(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—**

> **(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States**

In *Williams v. Taylor,* 529 U.S. 362, 412 (2000) (O'Connor, J., Opinion of the Court) the Supreme Court gave independent meaning to both the "contrary to" and the "unreasonable application" clauses of the statute. *See id.* at 405. Under the first prong of § 2254(d)(1), the Court stated that a decision may be "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), in two ways. First, "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams,* 529 U.S. at 405. Second, "[a] state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 405-406. [3]

Under the second prong of § 2254(d)(1), "[a] state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular

---

[3] The court interpreted the phrase "clearly established Federal law, as determined by the Supreme Court of the United States," a phrase shared by both clauses, to "refer[] to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. The statute thus "restricts the source of clearly established law" to the Supreme Court's holdings. *Id.*

11

prisoner's case" qualifies as "'an unreasonable application of . . . clearly established Federal law.'"  *Id.* at 407 (quoting 2254(d)(1)).  In determining whether a state-court decision unreasonably applies Supreme Court precedent, "a federal habeas court should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* at 409.  As the Court stressed, "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Id.* at 410 (emphasis in original).  Under the "unreasonable application" clause,  a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable. *Id.* at 411.  The First Circuit has explained the degree of error that must be shown by the petitioner to reach the level of an "objectively unreasonable" state court decision.  "[S]ome increment of incorrectness beyond error is required….The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court."  *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir. 2002) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

In addition, under AEDPA, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The "presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact." *Sumner v. Mata*, 455 U.S. 591, 593 (1982); *Norton v. Spencer*, 351 F.3d 1, 6 (1st Cir. 2003).

12

## ARGUMENT

I.  **THE STATE COURT'S ADJUDICATION OF GROUND ONE WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF** *TAYLOR V. LOUISIANA***, 419 U.S. 522 (1975) AND** *DUREN V. MISSOURI***, 439 U.S. 357 (1979);**

The Supreme Judicial Court (SJC) rejected the petitioner's claim in Ground One that he was denied the right to a fair trial because the jury venire did not adequately represent a fair cross section of the Essex County community.  The court concluded that the petitioner had not met his burden of making a prima facie case of jury underrepresentation of Hispanics, and its decision is fully in line with clearly established Supreme Court and First Circuit precedent.  *See Arriaga*, 438 Mass. at 561.   Given the deferential review mandated by AEDPA,  there is no legal basis whatsoever for habeas corpus relief on the petitioner's fair cross section claim.  *See Fortini v. Murphy*, 257 F. 3d 39, 47 (1st Cir. 2002)(AEDPA imposes a requirement of deference to state court decisions);. *Niland v. Hall*,  280 F.3d 6, 12 (1st  Cir. 2000)(same).

In its decision, the SJC emphasized at the outset that the United States Constitution requires that a  jury fairly represent a cross section of the community, "an essential component of the Sixth Amendment right to a jury trial. " *Arriaga, id. quoting Taylor v. Louisana*, 419 U.S. 522, 528 (1975). [4] It quoted *Taylor* at length, reiterating that a jury

---

[4] **Article 12 of the Massachusetts Constitution affords a defendant at least as much protection as the Sixth and the Fourteenth Amendment when its decisions on "fair cross section" claims are read together with the Supreme Court's decisions.** *Commonwealth v. Fryar*, 425 Mass. 237, 244,  680 N.E.2d 901 (1997).

[

13

cannot be an effective safeguard against the exercise of a arbitrary power if it represents

only special segments of the population, excluding distinctive groups from the pool.

*Arriaga*, *id.*  *See Commonwealth v. Soares*, 377 Mass. 461, 478, 387 N.E. 2d 499, *cert. denied*,

444 U.S. 881 (1979).  The court recognized the importance of maintaining the broad

representative character of the jury:

> The requirement that a jury comprise a representative cross section of the community simultaneously ensures that the jury will contribute the community's commonsense judgment to the proceedings.  *Commonwealth v. Soares*, *supra* at 479-480, 387 N.E.2d 499.  'When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.  It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.'  *Commonwealth v. Soares, supra* at 480-481, 387 N.E.2d 499, *quoting Peters v. Kiff*, 407 U.S. 493, 503-504, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972).

*Arriaga,* 438  Mass. at 562.

As the SJC noted, in order to establish a prima facie case of a violation of the fair

cross-section requirement, a defendant must show "(1)  that the  group alleged to be

excluded is a 'distinctive group' in the community; (2) that the representation of this group

in venires from which juries are selected is not fair and reasonable in relation to the

number of such persons in the community; and (3) that this underrepresentation is due to

the systematic exclusion of the group in the jury-selection process."  *Duren v. Missouri*, 439

U.S. 357,  364 (1979); *United States v. Royal*, 174 F. 3d 1, 5 (1st Cir. 1999); *United States v.*

*Hafen*, 726 F. 2d 21, 23 (1st Cir. 1979).

14

The SJC found that the petitioner met the first *Duren* element since it was undisputed that Hispanics comprised a "distinctive group" within Essex County. *Arriaga*, 438 Mass. at 563. However, the SJC concluded that the petitioner had failed to meet his burden of proof on the second and third elements. *Id.*

The data and figures proffered by the petitioner in support of his claim of underrepresentation of Hispanics in the Essex County petit jury venire were deemed invalid by the SJC and motion judge for several reasons. Reliance on surname analysis was found suspect since it failed to account for Hispanics who obtain an English surname through marriage or adoption or whose surnames are not commonly considered Spanish, were Anglicized or resulted from varied European ancestry. *Arriaga,* 438 Mass. at 564 *quoting Alen v. State.*, 596 So. 2d 1083, 1093 (Fla. Dist. Ct. App. 1992. aff'd, 616 Sol 2d 452 (Fla. 1993). "Non-Spanish surnames (e.g. Danchs, Dols, Galtieri, Cristiani, Domecq) are frequently found among Latin Americans but are not found in the Spanish surname lists." *Id.* The SJC had previously rejected surname analysis as an unreliable indication of ethnic identity. *Commonwealth v. Fryar*, 425 Mass. at 242; *Commonwealth v. Colon*, 408 Mass. 419, 438 n.11, 558 N.E. 2d 974 (1990). In addition the petitioner had submitted figures from a single venire which the SJC found was an unacceptably small sample for the purpose of any statistical showing of underrepresentation. *Arriaga*, 438 Mass. at 564. *See United States v. Rioux*, 97 f. 3d 648, 657 (2d Cir. 1996). "A defendant must do more than assess a small subsection of the venire present on a particular day in order to show that the group allegedly discriminated against is not fairly and reasonably represented in the venires in relation to its proportion of the community." *Arriaga,* 438 Mass. at 564. Other

15

jurisdictions endorse the use of broader time frames for the purpose of analyzing

underrepresentation. *See id.* and cases cited.

Even accepting the petitioner's figures, the SJC found that the data supplied would

not in any event support a claim of underrepresentation. *See Commonwealth v. Fryar*, 425

Mass. 237, 680 N.E. 2d 901 (1997)(similar constitutional challenge to Hamden County jury

selection system fails). Consistent with the majority of jurisdictions, including the Supreme

Court and the First Circuit, the SJC applied an "absolute disparity test" to determine

whether the second element regarding underrepresentation of a group was substantial.

*See, e.g., Duren v. Missouri*, 439 U.S. at 365 (employing absolute disparity test); *United*

*States v. Hafen*, 726 F. 2d at 24 (same); *Floyd v. Gamsen*, 996 F. 2d 947, 950 (8th Cir.

1993)(same); *Thomas v. Borg*, 159 F. 3d 1147, 1150 (9th Cir. 1998)(same). The SJC stated:

> To calculate absolute disparity, the percentage of a group's population in the
> jury venire is subtracted from the percentage of the group's population in the
> community. *See Commonwealth v. Fryar, supra* at 243, 680 N.E.2d 901. In this case,
> eligible Hispanics comprise 5.5 per cent of the community and, according to the
> defendants' surname analysis, comprise 1.46 per cent of the jury venire. The
> absolute disparity in this case is therefore 4.04 per cent. Courts adopting the
> absolute disparity test have held that a disparity below 10 per cent is generally not
> substantial. *Id.*, and cases cited. The disparity here, therefore, does not support a
> claim of a constitutional violation.

*Arriaga*, 438 Mass. at 565. *See United States v. Hafen*, 726 F. 2d at 23 (absolute disparity test

used to calculate the difference between the percentage of eligible blacks in the population

and the percentage of blacks on the master wheel); *United States v. Pion*, 25 F. 3d 18, 23 n.5

(1st Cir. 1994)(absolute disparity test measured the gross spread between the percentage of

eligible Hispanics in the relevant population and the percentage of Hispanic representation

on the Master Jury Wheel). The SJC rejected the petitioner's suggestion that it apply the

16

rival comparative disparity test as an alternative . The court had previously ruled in

*Commonwealth v. Fryar*, 425 Mass. at 242 n.6, as had the First Circuit in *United States v.*

*Hafen*, 726 F. 3d at 24, that the comparative disparity standard tended to overstate the

degree of underrepresentation in the case of a very small minority and that the absolute

disparity test was preferable. *See United States v. Pion*, 25 F. 3d at 23. Thus, the SJC's

methodology in arriving at the conclusion that the petitioner had failed to make a prima

facie case that the representation of Hispanics in venires from which juries were selected

was not fair and reasonable in relation to the number of such persons in the community

was not objectively unreasonable in light of the overwhelming number of jurisdictions that

apply the same absolute disparity test. The court mirrored the Supreme Court and the

First Circuit's own reasoning in reaching its conclusion.

The SJC also found that the petitioner had failed to meet the third element of the

*Duren* test, i.e, proving that any underrepresentation was due to systemic exclusion of

Hispanics in the jury selection process. *Arriaga,* 438 Mass. at 567.

> Exclusion is systematic when it is inherent in that process. Essex County,
> like all others, uses the "one-day one-trial" system set forth in G.L. c. 234A, in
> which the county submits an annual census list to the jury commissioner. Names
> from the census list are randomly sorted by a computer that then generates a list of
> randomly selected names for the jury pool. (Citations omitted.)

The motion judge noted that this system contains "no element of subjectivity in the

compilation of the venire" and has "much to commend it for its assurance of randomness

in the selection process," quoting *Commonwealth v. Colon*, 408 Mass. at 438. (Supp. Ans.

Exh. 5 at Add. 80 ).

17

However, the SJC did note that the one-day one-trial system"cannot completely ensure a jury pool that reflects the community's composition, if the basic data from which the selection is made fails to reflect, with some degree of accuracy, that composition." *Arriaga*, 438 Mass. at 568.  The court rejected the petitioner's proffer of a 1992 report from a Hampden County commission that concluded that data collection practices resulted in underrepresentation of minorities in that county since the report did not pertain to Essex County where the petitioner's jury venire was drawn and was not probative of the issue. *Id.*  The SJC's own study of jury unrepresentation had concluded that a disproportionate number of undeliverable summonses were addressed to inner city locations but that study focused on Suffolk, Worcester and Hampden counties and was also not pertinent to Essex County.  *Id.*  Although "census collection procedures may not fully identify all residents who are potentially available for jury duty, the [petitioners] have not demonstrated that these practices result in systematic exclusion of Hispanics from the jury pools of Essex County as a whole."  The SJC encouraged attempts to contact those who do not respond to summonses but opined that ultimately "the completeness and accuracy of juror lists depends in large part on the cooperation of citizens." *Id. quoting Commonwealth v. Fryar*, 425 Mass. at 244.

In sum the SJC's adjudication of Ground One regarding juror composition was fair, thorough and fully reflective of Supreme Court principles.  It surely was not objectively unreasonable for the SJC to conclude that the petitioner had failed to made a prima facie showing mandated by *Taylor*.

18

## II.    GROUND TWO DOES NOT STATE A FEDERAL CONSTITUTIONAL CLAIM.

In Ground Two, the petitioner faults the Single Justice of the SJC and trial judge for rejecting his post-trial motions for discovery and funds for experts and criticizes state officials because they did not require prospective jurors to identify their race or ethnic background on jury forms. [5] (Petition, Addendum C., Ground Two).  He claims that, through these actions or omissions, that he was denied the right to equal protection of the laws, to due process or law and meaningful access to the courts.   Despite the federal constitutional veneer, it is clear that this claim sounds purely in state law and cannot be the basis for federal habeas relief.  Errors of state law, in and of themselves, do not provide a basis for federal habeas corpus relief.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  It is not the province of a federal habeas court to reexamine state court determinations of state law questions.  *See Lewis*, 497 U.S. at 780-781.

By way of background, after his trial and conviction, the petitioner moved for approval of costs and expenses to retain a statistician and a Hispanic linguist and also for disclosure of jury attendance lists and clerks' lists. (Supp. Ans. Exh. 4 at A. 278).  He alleged that the purpose of the motions was to show that the jury selection process in place at the time of his trial in 1993 violated his Sixth and Fourteenth Amendment rights because the venire was not drawn from a source fairly representative of the community.  (Supp. Ans. Exh. 4 at A. 279). The motions, which were directed at the composition of the Hampden County grand jury and the Essex County petit jury, were referred to the Single

---

[5] In *Arriaga*, 438 Mass. at 559, the SJC, pursuant to its supervisory powers, directed the Jury Commissioner to amend the juror confirmation forms to require submission of racial and ethnic information to assist in obtaining reliable, statistically valid information.

19

Justice, (Greaney, J.).  He denied the motions with respect to the grand jury and remanded the motions concerning the trial jury to the trial judge. (Id. )

In her Memorandum of Law and Orders on Defendants' Motion for Extra Fees and Costs,  the trial judge concluded that the petitioner was unable to make a prima facie showing in support of his claims and denied the motions on February 8, 1996.  (Supp. Ans. Exh. 4 at A. 278-283.   The trial judge rejected the petitioner's preliminary showing in support of the motions, i.e, an informal survey conducted by Essex County bar advocates who had tried cases in the district courts between January 1993 and June 1995.  The judge also termed "hearsay evidence" an affidavit by a statistician analyzing the survey data. (Supp. Ans. Exh. 4 at A. 280).  The central purpose of the motion was to establish underrepresentation by obtaining the surnames of individuals summonsed for jury duty during the impanelment of his jury.  The petitioner claimed that the motion for disclosure of the jury lists was necessary to examine the prospective jurors' surnames and that the funds were necessary to retain a linguist to identify Hispanic names on the list. (Supp. Ans. Exh. 4 at A. 281).  The trial judge found this method "inherently unreliable" and the SJC ultimately agreed with the judge's conclusion. (Supp. Ans. Exh. 4 at A. 281). [6]

_____

[6] The SJC adopted the reasoning of the motion judge who found that the petitioner had not provided any credible basis to support his contention that a linguist could identify which names were Hispanic as opposed to Mediterranean.  The motion judge stated: "Even if such identification was reasonably likely, it is entirely possible that individuals who have Hispanic surnames are, in fact, not Hispanic as a result of name changes by marriage or other means.  Conversely it is entirely possible that Hispanic individuals who were summonsed for jury duty during the [petitioner's trial] will not have Hispanic surnames for the same reason.  Thus even if the items sought by the [petitioner] were collected there is no credible showing that any inference of juror representation could be drawn from the data." (Supp. Ans. Exh. 4 at A. 280-281.)  *See Arriaga*, 438 Mass. 570.

20

It is uncontested that the petitioner brought his motions for funds pursuant to G. L. c. 261, § 27C, in connection with his motion for a new trial.  The statute reads, in pertinent part, as follows:

> If the court makes a finding of indigency, it shall not deny any request with respect to normal fees and costs, and it shall not deny any request with respect to extra fees and costs if it finds the document, service or object is reasonably necessary to assure the applicant as effective a prosecution, defense or appeal as he would have if he were financially able to pay.

Under the plain terms of the statute and Massachusetts precedent, the petitioner was not entitled to funds for post-trial relief.  His motion for costs was not aimed at a "prosecution, defense or appeal" but contemplated a possible motion for a new trial. *Commonwealth v. Davis*, 410 Mass. 680, 684, 574 N.E.2d 1007 (1991). [7]

 Neither the United States nor Massachusetts Constitutions requires the Commonwealth to appoint counsel for indigent persons in preparing a motion for a new trial or to fund post-conviction investigations in connection with a motion for a new trial. *See Commonwealth v. Davis*, 410 Mass. 680, 684 n.7,  574 N.E.2d 1007, 1010 (1991). In *Ross v. Moffitt*, 417 U.S. 600, 609-616 (1974) the Supreme Court held that the state was not required to provide counsel on discretionary appeals to the state supreme court.  "The duty of the State...is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to present his claims fairly in the context of the State's appellate process." *Id*. at 616.  *See Dirring v. United States*, 353 F.2d 519, 520 (1st Cir.1965)(the Federal Constitution does not require a

_____

[7] A motion for a new trial under Mass. R. Crim. P. 30(a) and (b), 378 Mass. 900, is not considered an "appeal."  *Commonwealth v. Davis*, 410 Mass. at 684 n. 6.

21

court to appoint counsel to represent an indigent defendant in presenting a motion for a new trial); *Commonwealth v. Conceicao*, 388 Mass. 255, 261, 446 N.E.2d 383 (1983)(indigent defendant does not have an absolute right under Massachusetts Declaration of Rights Constitution to appointed counsel in preparing or presenting his motion for a new trial). Since indigent prisoners have no due process or equal protection right to appointed counsel in presenting a motion for a new trial, "then surely they have no constitutional right to state funding to support investigation in anticipation of such a motion. " *Commonwealth v. Davis,* 410 Mass. at 684 n.7.  The relevant statute restricts the payment of fees and costs to a prosecution, defense or appeal and where "the Legislature has chosen not to fund certain procedures not constitutionally mandated, [the SJC] may not rewrite the statute to do so."*Commonwealth v. Davis*, 410 Mass. at 684.  State courts are the ultimate expositors of state law. *Mullaney v. Wilbur*, 421 U.S. 684, 690 (1975).  Clearly this ground is a matter of state law which is immune from federal habeas review.

A habeas court does not have jurisdiction in a federal collateral attack of a petitioner's state conviction to review a claimed error of a state law.  A federal court may issue a writ of habeas corpus only when a conviction violates the constitution, laws or treaties of the United States.  *Estelle,* 502 U.S. at 67-68; 28 U.S.C. §§2241, 2254.  "Even if an error of state law could be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment," a federal court may not issue a writ to redress such a deprivation if the claims are merely ancillary to perceived errors of state law.  *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  *See Adelson v. DiPaola*, 131 F.3d at 262 n. 3; *Hamm v. Latessa*, 72 F.3d 947 (1st Cir. 1995), *cert. denied*, 519 U.S. 947

22

(1996).  *See also Pitts v. Lockart*, 911 F.2d 109, 111-112 (8th Cir. 1990), *cert. denied*, 501 U.S. 1253 (1991) (petitioner's claims that he was deprived of due process and equal protection were not grounds for habeas relief where his conviction was obtained in contravention of state law, no matter how "serious and fundamental the error" may have been).

The petitioner's contention that his federal constitutional rights were violated by the failure of state officials to require prospective jurors to identify their race or ethnic background on jury forms is meritless.  The petitioner did not cite any Supreme Court authority for this proposition in his brief to the Supreme Judicial Court, Supp. Ans. Exh. 1 at 47-48.  "[T]o our knowledge, there is none." *Tinsley v. Million*, 399 F.3d 796, 814 (6th Cir. 2005)(court rejected argument that because the state court did not keep records about dismissed jurors, habeas petitioner should be relieved of his burden of establishing a fair-cross-section violation).

## III. GROUND THREE REGARDING JURY INSTRUCTIONS IS PROCEDURALLY DEFAULTED.

On appeal the petitioner claimed a number of errors in the judge's jury instructions, i.e., the judge erred in giving an overly broad definition of malice; the extreme atrocity or cruelty instructions improperly created a conclusive presumption that pleasure or indifference to pain is cruelty;  the judge did not instruct that the jury had to find deliberate premeditation on the part of the petitioner to find him guilty on that theory; and the instructions directed the jury to find the petitioner guilty as an accessory for whatever crime the jury found his co-defendant Arriaga guilty.  *Arriaga*, 438 Mass. 573. (Supp. Ans. Exh. 1 at 9-19).

23

Because there was no objection to the instructions, the SJC reviewed the claims to determine whether there was error, and if so, whether the error created a substantial likelihood of a miscarriage of justice. *Arriaga*, 438 Mass. 573. This determination constitutes an adequate and independent state law ground within the meaning of the procedural default rule, thereby precluding habeas review. *See Brewer v. Marshall*, 119 F.3d 993, 999 (1st Cir. 1997), *cert. denied*, 522 U.S. 1151 (1998).

The "procedural default rule" reflects the Supreme Court's view that, in the interests of comity and federalism, a habeas court should "'not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Boutwell v. Bissonnette*, 66 F. Supp.2d 243, 245 (D. Mass. 1999), *quoting Coleman v. Thomson,* 501 U.S. 722, 729 (1991). Such independent and adequate state grounds exist where, as here, "'the state court declined to hear [the underlying claim] because the prisoner failed to meet a state procedural requirement.'" *Simpson v. Matesanz,* 175 F.3d 200, 206 (1st Cir. 1999), *cert. denied*, 528 U.S. 1082 (2000), *quoting Brewer*, 119 F.3d at 999.

Massachusetts has a "long-standing rule that issues not raised at trial ... are treated as waived." *Commonwealth v. Curtis*, 417 Mass. 619, 632 N.E.2d 821, 827 (Mass. 1994). The First Circuit has repeatedly recognized that "Massachusetts has ... routinely enforced, [and] consistently applied [the] contemporaneous objection rule," which requires a party to object to a perceived trial error at the time the error occurs to preserve the issue for appellate review. *See Burks v. Dubois*, 55 F.3d 712, 716 (1st Cir. 1995) (collecting cases); *see also Brewer*, 119 F.3d at 1001 (describing Massachusetts' contemporaneous objection

24

rule as "firmly entrenched").  Where, as here, a party fails to make a timely objection,
appellate review under Massachusetts law is limited to determining whether the alleged
error posed a likelihood of a miscarriage of justice.  *See Burks*, 55 F.3d at 716, n. 2;
*Commonwealth v. Carter*, 423 Mass. 506, 669 N.E.2d 203, 208 (1996) (standard for review of
unpreserved errors in capital case).

The limited review undertaken pursuant to the Massachusetts "miscarriage of
justice" standard does not operate as a waiver of the underlying procedural default.  *Burks,*
55 F.3d at 716, n. 2.  To the contrary, such review constitutes the "classic example of an
independent and adequate state ground" supporting application of the procedural default
rule.  *Simpson,* 175 F.3d at 207.  Habeas review, therefore, is precluded on this claim unless
the petitioner  "can demonstrate cause for default and prejudice stemming therefrom, or,
alternatively, unless [he] can show that a refusal to consider the merits of the constitutional
claim will work a miscarriage of justice." *Burks,* 55 F.3d at 716.  No such showing can be
made here.

"To excuse a procedural default, a petitioner's cause must relate to an objective
factor, external to the defense, that thwarted (or at least substantially obstructed) the
efforts of the defendant or his counsel to obey the state's procedural rule." *Burks*, 55 F.3d
at 716-17.  No such factor "external" to the defense existed here.  There was, for instance,
no governmental interference that prevented the petitioner from complying with the state
procedural rules. *See  Murray v. Carrier*, 477 U.S. 478, 488 (1986).  The only other potential
cause available to the petitioner is alleged attorney error or oversight in failing to timely
object.  It is well settled, however, that attorney error or oversight is not sufficient cause for

25

excusing a procedural default unless it rises to the level of constitutional ineffective assistance. *See id.; Burks*, 55 F.3d 712. Nor can the petitioner demonstrate actual prejudice sufficient to excuse his default. *See Coleman*, 501 U.S. at 750. Absent cause and actual prejudice sufficient to excuse his procedural default, the only other avenue available to the petitioner – that a refusal to hear his defaulted state law claim would result in a "fundamental miscarriage of justice" – is foreclosed. *Simpson*, 175 F.3d at 210. This exception to the procedural default rule is "'seldom to be used, and explicitly tied to a showing of actual innocence.'" *Killela v. Hall*, 84 F. Supp.2d 204, 210 (D. Mass. 2000), *quoting Burks*, 55 F.3d at 717. As the recounting of the evidence against the petitioner by the trial judge in her Memorandum and Order reveals, no such showing of innocence could be made here.

> The evidence of Delgado's and Arriaga's culpability in this murder was overwhelming...

> As to Delgado, the jury had in evidence before them what the Commonwealth has aptly described as a death warrant. This so-called "mission statement" was signed by Delgado. Cintron and Gonzalez testified in detail about Delgado's and Arriaga's involvement in the murder. Their testimony, along with Mercado's was corroborated by the physical evidence in the case.

> The victim was shot in the heart and head, as ordered by Delgado and Hernandez. Latin King colors were found at the murder scene. Delgado's fingerprints were found on the hangar he used to attach the license plate to the Gonzalez car. This hangar was found in the exact location where Cintron and Gonzalez said they disposed of the evidence. The gun and knife were recovered; again significant corroboration of Cintron, Gonzalez's and Mercado's testimony. Phone records confirmed the post-murder call from Hartford to the Bancroft Street headquarters.

> The [petitioner] Delgado left a paper trail of guilt in his jail cell and in his correspondence to others. Many of these documents not only corroborated the testimony of the trial witnesses who were present in the Bancroft Street

26

headquarters on the day of the murder but when viewed independently constitute admissions by the [petitioner] Delgado that his order to "terminate" the victim, meant an order to murder the victim.

He wrote to Mercado from his jail cell following his arrest and in that correspondence made it clear that her childrens' safety was in jeopardy if she didn't remain silent about what happened. The defendant Arriaga tag-teamed the [petitioner] Delgado in the writing campaign to intimidate Mercado by sending her a newspaper photograph of Hernandez, who was her boyfriend, the father of her children and a lead in the plan to kill the victim. None too subtly, Arriaga had drawn a picture of dripping blood across the photograph of Hernandez' face.

All of this evidence was elicited during the Commonwealth's case in chief and overwhelmingly proved the guilt of both Delgado and Arriaga. Delgado testified and did not assist himself by that testimony. The evidence against him was so powerful, he could not explain it away. Indeed he finally admitted that he did order a "mission" against the victim but insisted that his mission order was simply that his underlings beat the victim.

(Supp. Ans. Exh. 5 at Add. 36-37).

IV.    THERE IS NO CLEARLY ESTABLISHED SUPREME COURT PRECEDENT MANDATING DISCLOSURE OF A "SECRET"AGREEMENT WHERE THE STATE COURT HAS MADE A PRESUMPTIVELY CORRECT FINDING OF FACT THAT THERE WAS NO EVIDENCE OF A SECRET AGREEMENT.

In his state appeal the petitioner alleged that the Commonwealth withheld the terms

of the plea agreement under which Maria Mercado testified at trial and made false and

misleading statements to the jury, citing *Kyles v. Whitley*, 514 U.S. 419, 453 (1995) and

*Giglio v. United States*, 405 U.S. 150, 153-155 (1972). (Supp. Ans. Exh. 1 at 41-43). He

suggested that there was a secret agreement with the prosecution for Mercado to testify

without regard to the truth and that promises were made that she would not be prosecuted

for perjury even if she lied at trial. (Supp. Ans. Exh. 1 at 42-43). The petitioner stated that

he was "entitled to show the jury that the 'agreement' under which Mercado testified was

for show only, a circumstance which might- in the jury's estimation- discredit the

27

prosecution and the testimony of other witnesses who had similar agreements." (Id. )  He

claimed that the concealed"information" was subject to disclosure under *Kyles* and *Giglio*.

The SJC rejected the petitioner's arguments "for the same reasons as the motion

judge; they are without merit."  *Arriaga*, 438 Mass. at 580-581.  The motion judge had

noted in her decision that the petitioner was staking his motion for a new trial "on yet

another amended and substituted supplemental claim" in which he basically said that the

Commonwealth did not inform the petitioner or his counsel of the true terms under which

Mercado's testimony was given.  (Supp. Ans. Exh. 5 at Add. 93).  Characterizing the

written argument in support of the claim "vague and misleading," the trial judge

summarized the petitioner's position and rejected the claim as baseless:

> It appears that the [petitioner] says that the Commonwealth had a private agreement to treat Ms. Mercado leniently even if she gave perjured testimony. There is nothing in the record that would in anyway reasonably support such a grave accusation.  It is a reckless accusation made more than five years after the trial of these two defendants and, in this judge's view, represents an ill conceived effort by the [petitioner] to delay the just and final conclusion of this case.

(Supp. Ans. Exh. 5 at Add. 93-94).

Thus,  both the SJC and the motion judge discounted the unfounded charge that the

Commonwealth and Maria Mercado had entered into a clandestine agreement that was not

disclosed to the petitioner or his defense attorney, in violation of state and federal case law,

criminal rules and ethical canons.  Indeed, if such an agreement did exist, the government

would have been obligated to disclose it under *Giglio v. United States*, 405 U.S. 150, 154-55,

(1972); *United States v. Tse*, 375 F.3d 148, 165 (2004). The petitioner failed to lay any

factual foundation to support his speculative and scandalous supposition that there was

28

such an agreement. *See Bui v. DiPaolo*, 170 F.3d 232, 245 (1st Cir.1999) ("[A] defendant ... must present a satisfactory foundation for the critical elements on which his hypothesis of bias depends."); *United States v. Tse*, 375 F.3d at 165 (argument relied solely on a speculative theory of quid pro quo and was entirely unsupported by evidence).  There is no clearly established Supreme Court precedent that mandates disclosure where a court has found that there was no factual basis indicating the existence of an secret agreement between a prosecutor and witness. (Supp. Ans. Exh. 5 at Add. 93).

       The Supreme Court precedents relied on by the petitioner in his appeal apply only when the existence of an agreement or evidence has been established. Ground Four is essentially a hollow *Brady* claim.  *Brady v. Maryland*, 373 U.S. 83 (1963) prohibits prosecutors from failing to disclose evidence favorable to an accused where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  *Id.* at 87.  In determining whether evidence not disclosed by the state is "material," the cumulative effect of all suppressed evidence favorable to the defendant is considered rather than individual items of evidence.  *Kyles v. Whitley*, 514 U.S. at 4.  It is a violation of due process for the government to fail to disclose a promise made to a witness that he or she would not be prosecuted in return if he testified for the prosecution.  *Giglio*, 405 U.S. at 150.  However there is no evidence of any such promise.

        The state court factual determination that there was no evidence that a secret agreement existed is presumed to be correct," unless the petitioner rebuts the presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir.2000); *Niland v. Hall*, 280 F.3d 6, 11 (1st  Cir. 2000).  "Unless the petitioner can

29

carry this heavy burden, a federal habeas court must credit the state court's findings of

fact--and that remains true when those findings are made by a state appellate court as well

as when they are made by a state trial court." *Rashad v. Walsh*,   300 F.3d 27, 35 (1st Cir.

2002).

V.    **THE STATE COURT ADJUDICATION OF GROUND FIVE WAS NOT
      CONTRARY TO NOR AN UNREASONABLE APPLICATION OF STRICKLAND
      V. WASHINGTON**, 466 U.S. 668 (1984).

In Ground Five the petitioner asserts that he was denied the effective assistance of

counsel because his trial attorney failed to document a fair cross section challenge to jury

composition or request funds to fully investigate the claim; failed to timely object to jury

instruction and failed to request a cautionary instruction warning the jury to closely

scrutinize Mercado's testimony. (Petition, Addendum C. at 1-6).

The SJC and the motion judge noted the meager support offered by the defendants

to substantiate this ineffective assistance of counsel claim:

> [T]he defendants each argue that their respective counsel rendered
> ineffective assistance in failing to preserve error and to pursue and develop the
> motions to dismiss the venire.  Little is offered by either defendant to support these
> contentions.  As discussed above, there is no basis  for us to conclude that the
> claimed underrepresentation of Hispanics was substantial or resulted from
> systematic exclusion in the jury selection process.  The defendants have not
> demonstrated that trial counsel erred in failing to pursue the motions to dismiss the
> venire and have not demonstrated a substantial likelihood of a miscarriage of
> justice.  *Commonwealth v. Wright, supra* at 682, 584 N.E.2d 621 (1992).

*Arriaga*, 438 Mass. at 583.

In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Supreme Court

established that a violation of the right to effective assistance of counsel has two

components.

30

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Under the performance prong of *Strickland*, a party claiming ineffective assistance must prove that counsel's performance fell below an "objective standard of reasonableness." *Id.* at 687-88. There is a "strong presumption" that counsel's strategy and tactics fall "within the range of reasonable professional assistance," and courts should avoid second-guessing counsel's performance with the use of hindsight. *Id.* at 689. As the Supreme Court has explained, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction. . . , and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689; *see also Phoenix v. Matesanz*, 233 F.3d 77, 81 (1st Cir. 2000) (discussing the "deferential standard" of review and the "strong presumption" of effectiveness under *Strickland*). The mere fact that counsel chose a stratagem that "'may, in retrospect, have proved unsuccessful, or even unwise,'" does not render counsel's assistance ineffective in the constitutional sense. *Phoenix*, 233 F.3d at 81 (quoting *United States v. Natanel*, 938 F.2d 302, 310 (1st Cir. 1991), *cert. denied*, 502 U.S. 1079 (1992)). Instead, it is well established that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" because such decisions are presumptively within the "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. It is only where, given the facts then

31

existing, counsel's "choice was so patently unreasonable that no competent attorney would have made it," that the ineffective assistance prong of *Strickland* may be satisfied.  *Phoenix*, 233 F.3d at 82, n.2.

Under the prejudice prong of *Strickland*, a party claiming ineffective assistance must show "that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different."  *Strickland*, 466 U.S. at 694.  Not all errors by counsel are sufficient to satisfy this standard.  *Id.* at 693.  Rather, a "reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  The Supreme Court has described this as a "highly demanding" and "heavy burden."  *See Williams*, 529 U.S. at 393.

As the Commonwealth pointed out in its brief, the petitioner essentially reargued every prior allegation of error in the guise of claims of ineffective assistance of trial counsel. *Commonwealth v. Waite*, 422 Mass. 792, 807,665 N.E. 2d 982 (1996)(Supp. Ans. Exh. 5 at 41-42).  The petitioner cannot meet *Strickland*'s heavy burden of proof since none of the alleged failings of defense counsel amount to ineffective assistance in a federal constitutional context.

Trial counsel's alleged failure to document a fair cross section challenge to jury composition in Essex County did not constitute deficient performance since there was no proof of the systematic exclusion of Hispanics in the jury selection process.   As the SJC found, under the Essex County "one day one trial" system established in G. L. c. 234A,  the county submits an annual census list to the jury commissioner.   Names from the census list are then randomly sorted by a computer which generates a list of randomly selected names

32

for the jury pool. *Commonwealth v. DeArmas*, 397 Mass. 167, 170, 490 N.E. 2d 433 (1986). As noted previously, this process contains "no element of subjectivity" in the compilation of the venire. *Commonwealth v. Colon*, 408 Mass. at 438. The SJC arrived at this same conclusion in the petitioner's appeal and in past cases regarding a challenge to the Essex County system. *See Commonwealth v. Tolentino*, 422 Mass. 515, 518-523, 663 N.E. 2d 846 (1996).

In addition, counsel's failure to seek funds pre-trial for an expert did not demonstrate ineffectiveness. *See Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (petitioner's speculative claim regarding what an uncalled expert would have testified to, unsupported by any evidence, did not demonstrate ineffective assistance of counsel*)*.

The SJC concluded that the jury instructions to which no objection was made did not create a substantial likelihood of miscarriage of justice. Under Massachusetts precedent, if an error not objected to by trial counsel does not create a substantial likelihood of a miscarriage of justice, see G.L. c. 278, § 33E , a claim of ineffective assistance of counsel with respect to such error will not succeed. *Commonwealth v. Wright*, 411 Mass. 678, 681-682, 584 N.E.2d 621 (1992). The SJC carefully reviewed the jury instructions, applied Massachusetts precedent and found no error on various grounds, i.e., instruction conveying old and new definitions of malice adequately conveyed meaning of malice to the jury; state law rule on factors to consider in extreme atrocity or cruelty cases was properly applied; and instruction on premeditation and individual guilt were sufficient under prevailing precedent. *Arriaga,* 438 Mass. at 572-575. State courts are the ultimate expositors of state law. *Mullaney v. Wilbur*, 421 U.S. 684, 690 (1975). Jury "[i]nstructions in

33

a state trial are a matter of state law to which substantial deference is owed." *Niziolak v. Ashe*, 694 F.2d 282, 290 (1st Cir. 1982) (citations omitted). The trial attorney's failure to object to instructions which the state's highest court had found proper cannot amount to ineffectiveness. Finally, trial counsel's failure to request a cautionary instruction warning the jury to closely scrutinize Mercado's testimony did not result in any prejudice to the petitioner since the judge included such an instruction in her final charge to the jury (Tr. 9/20 at 151-152).[8] *Arriaga*, 438 Mass. at 578. *See United States v. Dailey*, 759 F.2d 192, 196, 200 n. 8 (1st Cir.1985) (the jury should "be specifically instructed to weigh the accomplice's testimony with care"); *Commonwealth v. Ciampa*, 406 Mass. 257, 266, 547 N.E. 2d 314 (1989)(judge need not use specific words but must focus the jury's attention on the particular care they must give in evaluating testimony given pursuant to a plea agreement that is contingent on the witness's telling the truth). Clearly, the state court adjudication rejecting the petitioner's ineffective assistance of counsel claim was not contrary to nor an unreasonable application of *Strickland*.

## CONCLUSION

For the above-stated reasons, the petition should be dismissed.

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL

/s/ Annette C. Benedetto
Annette C. Benedetto
Assistant Attorney General

---

[8] The respondent is submitting the transcripts of the petitioner's trial contained in twelve volumes with this memorandum.

34

**Criminal Bureau**
**One Ashburton Place**
**Boston, Massachusetts 02108**
**(617) 727-2200**
**BBO No. 037060**

<u>**CERTIFICATE OF SERVICE**</u>

     **I hereby certify that this document filed through the Electronic Case Filing system will be sent electronically to the registered participant as identified on the Notice of Electronic Filing.**

**John M. Thompson**
**Thompson & Thompson**
**1331 Main Street**
**Springfield, MA 01103**

                           **/s/ Annette C. Benedetto**
                           **Annette C. Benedetto**
                           **Assistant Attorney General**

**Dated: August 25, 2006**