UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL NO. 04-30124-MAP


ALEX DELGADO, Petitioner,

vs.

KATHLEEN M. DENNEHEY, Respondent.

———————————————————————

PETITIONER'S MEMORANDUM IN OPPOSITION
TO RESPONDENT'S MOTION TO DISMISS
———————————————————————

Petitioner Alex Delgado opposes Respondent Kathleen M. Dennehy's August 25, 2006 Motion To Dismiss and submits this memorandum in support of that opposition.

Petitioner asserts five claims in support of his petition for relief:

1.  His right to trial by a jury representing a fair cross section of the community from which his jury was selected was violated.

2.  His rights to due process of law, to equal protection of the laws and to fair access to the courts was denied by the state's failure to collect data recording the racial or ethnic identity of the prospective jurors; the state's refusal to provide him, as an indigent defendant pursuing a direct appeal of his conviction, with the data and financial support needed to fully present his federal constitutional fair cross section claim; and the state's refusal,

1

in view of his indigency, lack of resources and lack of access to more accurate data, to accept his preliminary data as reliable for purposes of ruling on his requests for discovery and financial assistance in preparing and presenting his fair cross section claim.

3.  Three jury instructions violated his right to due process of law: an instruction defining the element of malice so broadly as to permit the jury to find malice without actual proof of that element; an instruction permitting the jury to find the element of extreme atrocity or cruelty without reference to limiting factors designed to cure the unconstitutional vagueness of that element; and an instruction creating an irrebuttable presumption of the element of cruelty.[1]

4.  The prosecution presented a false version of the terms of the agreement under which its rewarded witness Maria Mercado, an alleged coconspirator in the murder, was testifying.

5.  Trial counsel provided ineffective assistance in [a] failing to fully document the fair cross section claim he asserted before trial; and [b] in failing to object to the jury instructions challenged in claim three.[2]

---

[1]

Petitioner hereby withdraws all but his claim that the malice jury instruction violated his right to due process.

[2]

In his petition, Petitioner alleged that trial counsel failed to request an instruction directing the jury to give special scrutiny to Maria Mercado's testimony.  Because Respondent's point that such

2

Respondent has moved to dismiss all five claims on the ground that Petitioner has failed to state a claim on which relief can be granted with respect to each.  Specifically, Respondent argues that the Supreme Judicial Court's decision in <u>Commonwealth v. Arriaga</u>, 438 Mass 556 (2003) rejecting Petitioner's fair cross section claims [Claim One] was neither contrary to established federal constitutional law nor involved an unreasonable application of it; that Petitioner's due process, equal protection and access to the courts claims [Claim Two] only amount to claims of state law error; that the state court decisions rejecting his jury instruction claims [Claim Three] rest on the independent and adequate state grounds of procedural default; that his Napue/Giglio claims regarding Maria Mercado's reward-for-testimony agreement are unsupported by evidence and that this Court is bound by state court findings to that effect; and that Petitioner's ineffective assistance of counsel claims are without merit.

Claims One, Two and Five are interrelated.  Because the Court has permitted Petitioner to engage in further fact development on Claim One, Respondent's motion to dismiss is premature as to Claim One and Claim Two, and part [a] of Claim Five.  That is, if Petitioner is able to obtain and develop the data denied to him in the state courts, Claim One can be decided on its merits after full

---

an instruction was actually given is accurate, Petitioner withdraws this element of his claim five.

factual development and Claims Two and Five [a] will become moot. If he is unable, the latter two claims will have to be decided.

In this Memorandum, Petitioner rebuts each of Respondent's arguments. As to Claim One, he establishes that fair evaluation of the merits of his claims depends upon full development of the underlying facts. As to Claim Two, he establishes that the question of whether due process, equal protection and access to courts principles apply to the post-conviction, pre-appeal proceedings in which he sought to obtain the data and resources needed to develop the factual basis for his fair cross section claim is itself a federal question. Because the proceedings were integral to and designed to facilitate his direct appeal, they were subject to those federal constitutional requirements. Whether those requirements were violated depends on whether Petitioner's habeas efforts to develop the factual basis for his fair cross section claims is successful.

As to Claim Three, Petitioner withdraws the parts of his claim asserting error in the two instructions associated solely with the extreme atrocity or cruelty theory of first degree murder because, since he was also convicted of first degree murder by deliberate premeditation, a ruling in his favor on either of the extreme atrocity or cruelty claims would not provide grounds for habeas relief. Petitioner presses his claim that the instruction defining malice aforethought violated his right to due process by diluting

4

that definition.  He establishes that trial counsel's failure to object to that instruction constituted ineffective assistance of counsel constituting "cause" to excuse this procedural default. Petitioner further establishes prejudice by demonstrating that this instructions eased the prosecution's burden of proof the key element which makes an unlawful homicide murder in Massachusetts law.  Thus this Court has jurisdiction to decide this claim on its merits.

As to Claim Four, Petitioner establishes that the actual terms under which Ms. Mercado was to be rewarded for her testimony were not disclosed to him and that the representation to him and the jury that Ms. Mercado's deal was dependent on her giving truthful testimony was false and misleading; this deception violated his right to due process of law because the discrepancy was material. Ms. Mercado testified falsely in both his trial and in the trial of his codefendant Hugo Morales.  Her false testimony was known to the prosecutor who nevertheless rewarded her with a very generous measure of sentencing leniency.  This course of action artificially bolstered Ms. Mercado's testimony and deprived Petitioner of material cross-examination opportunities.

As to Claim Five, Petitioner establishes that his counsel was ineffective in failing to fully document his fair cross section claim before trial was error; whether it was prejudicial in constitutional terms depends on the outcome of Petitioner's fact

development efforts.    Petitioner further establishes that trial counsel was ineffective in failing to object to the flaw in the jury instruction which is established in Claim Three and that the instruction was prejudicial.

The errors established with respect to Claims Three and Four merit habeas relief on the present record.

## BACKGROUND OF THE CASE

For the most part, Respondent's description of the travel of this case is accurate but it is incomplete.    Respondent's assertion that defense counsel requested that the jury be drawn from Essex County is not accurate.    Petitioner's defense counsel, David P. Hoose, Esq., stated in his seven page affidavit that he did not request that the venue be moved to a specific county and was not familiar with Essex County, its population makeup or distribution.[3]

Before trial, Delgado's defense counsel made a last-minute fair cross-section challenge to the Essex venires based on his observations of the appearances of the 345 venire members. Supplemental Answer ["SA], Document 2:140-143. This challenge was unsupported by statistical evidence and was limited to the counsel's visual observations of the people in the venires from which the jury was drawn.    Id.

---

[3]

The last page of Attorney Hoose's affidavit is missing from the Supplemental Answer filed by Respondent.  Petitioner is searching for the complete document and will file it when and if he locates it.

In 1993, neither the Jury Commissioner nor any other state officia collected information on the ethnic or racial identity of prospective jurors.[4]  However, by statute the numbered residency list which each city and town submits to the Jury Commissioner and the Commissioner's randomly generated prospective jury list for each city and town are available upon request for inspection by the public.  M.G.L. c. 234A, §§10, 15.  With these lists, a criminal defendant could conceivably survey [overlooking the cost in funds and personnel needed to carry it out] the individuals identified in these lists and determine the racial and ethnic identity of each by asking them to identify themselves racially and ethnically.  See, Commonwealth v. Aponte, 391 Mass 494, 497 (1984).  Trial counsel did not do this before Petitioner's trial.  Appellate counsel attempted to do this but was unable, because he was denied access to the lists and denied the funds needed to do the survey and statistical analysis of the data.

Following Petitioner's conviction, on September 16, 1995 he filed a motion in the Supreme Judicial Court for Suffolk County [Single Justice session] for (1) funds to retain a statistician and an Hispanic linguist and (2) an order requiring disclosure of the

---

[4]

In its opinion denying Petitioner's appeal, the SJC directed the Jury Commissioner to institute, "as soon as practicable," a system of requiring prospective jurors to identify their race or ethnicity, admitting that its system of merely requesting that information had been ineffective.  Arriaga, 438 Mass at 571-572.

grand jury and petit jury attendance lists and clerk's lists.  The Single Justice denied the motion as to the grand jury and remanded the balance to the Superior Court.  <u>Arriaga</u>, 438 Mass at 569; SA, document 2:48-49.  The Superior Court denied the motion on February 8, 1996, ruling that Delgado had no reasonable prospect of making a prima facie showing that Hispanics are not fairly and reasonably represented in the venires in relation to their proportion in the community.  Petitioner filed an interlocutory appeal; a single justice of the Appeals Court upheld the Superior Court's ruling on July 6, 1996. Id.

On April 29, 1996 Arriaga's counsel, acting on behalf of both defendants, made a Freedom of Information Act request of the Jury Commissioner for the Essex County juror attendance records for January through September, 1993.  SA, document 4:251.  On the advice of the General Counsel for the Administrative Office of the Trial Court, the Jury Commissioner denied that request on May 21, 1996, asserting that the information was exempt from disclosure absent a court order.  Id:249-250.  On June 5, 1997 Arriaga's counsel made a written request for disclosure of the Jury Commissioner's ch. 234A §15 lists for Essex County for January through September 1993. Id:252. Again this request was denied. Affidavit of Charles K. Stephenson, Esq., Exhibit A, attached. Nevertheless, the state courts ruled that Petitioner had not been denied access to "basic information from which they could proceed

to discover the ethnic identity of prospective jurors." <u>Arriaga</u>, 438 Mass at 572.  This is an unreasonable finding in view of the evidence before the court.  <u>Norton v. Spencer</u>, 351 F3d 1, 8 (1st Cir. 2003).

Throughout this time, Petitioner was indigent.  Although Massachusetts law empowered a trial court to grant funds to a defendant before trial to hire experts and investigators to prepare his defense, it did not authorize such expenditures to assist in presenting postconviction claims.  <u>Commonwealth v. Davis</u>, 410 Mass 680, 682-84 (1991).  Petitioner's requests for funds for expert assistance were denied on this ground and these denials were upheld on appeal.  <u>Arriaga</u>, 438 Mass at 569.

Petitioner Delgado testified in his own defense.  He admitted participating in the gang leadership's discussion of Cintron's dispute with Esteras and a decision that action would be taken against Esteras.  Mr. Delgado said that the action the leadership authorized was a beating and that Arriaga and Cintron acted independently in murdering Esteras.  Maria Mercado's testimony that Delgado and the rest of the leadership authorized Esteras's murder was critical evidence against Delgado.

STANDARDS OF REVIEW

The sole ground for Respondent's motion to dismiss is Petitioner's failure to state a claim on which relief can be granted.  Rule 12(b)(1), Federal Rules of Civil Procedure.  This is

the equivalent of the common law demurrer, asserting that the petitioner's claims rest either on a legal theory that is not cognizable in federal habeas or that the petition fails to allege facts sufficient to support a cognizable legal claim. In ruling on such a motion, the federal court presumes that all well-pleaded allegations are true, resolves all doubts and inferences in the petitioner's favor, and views the pleading in the light most favorable to the non-moving party. <u>Albright v. Oliver</u>, 510 U.S. 266, 267 (1994). The issue is whether the litigation should be aborted because the petitioner's petition is fatally flawed and cannot succeed under any circumstances. <u>Port Authority of New York v. Arcadian Corp</u>., 189 F3d 305, 312 (3rd Cir. 1999).

Because the AEDPA places a new constraint on the power of a federal habeas court to grant a habeas corpus relief [as opposed to a limitation on the court's Article III power to adjudicate cases within its jurisdiction], the first task of the Court is to determine whether Neverson's constitutional rights were violated. <u>Hurtado v. Tucker</u>, 245 F3d at 16. This is the method used by the Supreme Court in <u>Williams v. Taylor</u>, 529 U.S. 362 (2000)[5]. Justice O'Connor stated: "In sum, §2254(d)(1) places a new constraint on

---

[5]The opinion of the Court on the statutory interpretation issue was written by Justice O'Connor in Part II of her concurring opinion. 529 U.S. at 401-413. The opinion of the Court applying §2254(d)(1) to the state court opinion at issue was written by Justice Stevens in Part IV of his opinion. 529 U.S. at 391.

the power of a federal habeas court to grant a state prisoner's
application for a writ of habeas corpus with respect to claims
adjudicated on the merits in state court.  Under 2254(d)(1), the
writ may issue only if one of the ... two conditions (specified in
the statute) is satisfied...." and "Section 2254(d)(1) defines two
categories of cases in which a state prisoner may obtain federal
habeas *relief* with respect to a claim adjudicated on the merits in
state court."  529 U.S. at 404 (Emphasis added).

The state court's opinion is evaluated for the reasonableness
of its analysis, which has a strong bearing on the reasonableness
of its conclusions.  In making this determination, the federal
court should not be too deferential: "the statute directs federal
courts to attend to every state court judgment with utmost care,
but it does not require them to defer to the opinion of every
reasonable state-court judge on the content of federal law."
Williams, 529 U.S. at 389.  Pointing out that Justice O'Connor in
Williams said "Reasonableness is a concept, not a constant," the
First Circuit referred approvingly to the discussion of this issue
in Hertz & Liebman, Federal Habeas Corpus Practice and Procedure
§32.3, 1449 (4th ed. 2001), where it is noted that the Supreme Court
in Williams found the state court's decision to be unreasonable
despite the fact that other courts had reached the same conclusion.
McCambridge v. Hall, 303 F3d 24, 36-37 (1st Cir. 2002).  At the
same time, a finding of some degree of error is not enough; the

11

state court's ruling must involve an unreasonable application of established federal constitutional law.  Id.  Several courts use the "clear error" standard in this context.  E.g., <u>Dixon v. Snyder</u>, 266 F3d 693, 700-01 (7th Cir. 2001); <u>Wilcox v. McGee</u>, 241 F3d 1242, 1244 (9th Cir. 2001).

But where the state court addressed only part of the habeas petitioner's claim, no deference is given on the issues not addressed.  <u>Battenfield v. Gibson</u>, 236 F3d 1215 (10th Cir. 2001). In <u>Battenfield</u>, the state court did not address two aspects of petitioner's ineffective assistance of counsel claim: that counsel failed to adequately investigate, and that counsel's shortcomings had been prejudicial.  As to those issues, the Court of Appeals held that it was free to exercise its independent judgment.  236 F3d at 1228 n. 7 and 1234.  Similarly, in <u>Dixon v. Snyder</u>, the Court said "[b]ecause the Illinois court did not decide whether counsel's failure to present rebuttal evidence fell below the required level of performance, we may consider that issue without any deference to the state court's conclusions."  266 F3d at 702, 703 [likewise with regard to counsel's decision not to present available evidence].

Finally, where the state court's findings do not address all the issues raised, the federal court must examine the state court record and make supplemental findings.  <u>Dixon v. Snyder</u>, 266 F3d at 695 ["The district court did not determine any of the state court's

factual findings were incorrect, it simply supplemented the factual discussions in the state court opinion after a review of the trial record."].

Respondent invokes the presumption of correctness of the state court's findings of fact.[6]  This presumption applies only to findings of basic, primary or historical facts and not to mixed questions of fact and law, which require the application of a legal standard to the historical fact determinations.  Keohane v. Thompson, 516 U.S. 99, 110 (1995), citing Townsend v. Sain, 372 U.S. 293, 309 n. 6 (1963); Coombs v. Maine, 202 F3d 14, 18 (1st Cir. 2000)["factual issues" are limited to "basic, primary or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators.'"].  Respondent must establish that the state court record reveals an adjudication of a factual issue on the merits in state court proceedings that resulted in a decision involving an explicit or clearly inferrable finding of historical fact which can be subjected to federal court review. Boyette v. LeFevre, 246 F3d 76, 80, 88 (2nd Cir. 2001) ["Because the (state court) did not specify which documents Boyette failed to show were suppressed, we have no discernable finding of fact to

---

[6]
"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(d)(1).

which we can defer." "AEDPA deference is due only to factual findings ... that we can fairly infer from the state court opinion."].

ARGUMENTS

I.  <u>Respondent's Motion To Dismiss Claim One Is Premature</u>.

A fair cross section claim is adjudicated by the placing the burden on the defendant to establish a prima facie case that this constitutional protection has been violated, following which the burden shifts to the state to justify the practice which produced the problem.  The elements of a prima facie case are: "[1] that the group alleged to be excluded is a 'distinctive group' in the community; [2] that the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and [3] that this under representation is due to the systematic exclusion of the group in the jury-selection process." <u>Duren v. Missouri</u>, 439 U.S. 357, 364 (1979).

Respondent concedes that the first criterion has been met but argues that Petitioner failed to establish the second and the third, and that the Supreme Judicial Court's ruling that Petitioner failed to meet his burden of proof on those two did not involve an unreasonable application of Supreme Court holdings on this subject.

The record establishes without dispute that Petitioner was indigent at all time throughout the state court trial and appeal,

14

and that he did not have access to the financial resources to hire appropriate experts needed to make the statistical showing necessary to establish the systematic under representation required.  <u>Arriaga</u>, at 569 & n. 6.  In ruling on the merits of Petitioner's fair cross-section claim, the state courts ignored this issue, and the issue of Petitioner's lack of access to the jury commission records needed to determine what the actual composition of the jury venires[7] actually was.  This in itself was unreasonable.  See, <u>Norton v. Spencer</u>, 351 F3d 1, 8 (2003) ["A state court decision may be 'unreasonable if it is devoid of record support for its conclusions or is arbitrary.'"]

Respondent also argues that the state courts' exclusive reliance on the "absolute disparity" method of measuring the extent of under representation was consistent with Supreme Court precedents.  The only Supreme Court authority cited is <u>Duren</u>, in which – according to Respondent – the absolute disparity test was used [the appropriateness of that method was not at issue in <u>Duren</u> and has not been litigated in the Supreme Court].  This is not an accurate reading of <u>Duren</u>.  There the Court approved the use of census figures to establish the fair cross section "benchmark": the percentage of women in the population [54%].  It then noted that

---

[7]

The source bodies to be examined are: "jury wheels, pools of names, panels, or venires from which juries are drawn...."  <u>Taylor v. Louisiana</u>, 419 U.S. 522, 538 (1975).

15

only 15% of the venires were women, pointed out that this
constituted only one in six and found this to constitute a "gross"
under representation. <u>Duren v. Missouri</u>, 439 U.S. 357, 366 (1979).
Sensibly, the Supreme Court neither employed nor identified a
specific method of statistical analysis; the question was whether
the representation was "fair and reasonable."  It stands to reason
that any method which aids the court in making this qualitative
assessment will be consistent with <u>Duren</u>.

Further, the SCJ acknowledged that its preferred "absolute
disparity" method might work to approve venires from which members
of a numerically small minority are "totally missing" but said that
it would not apply the 10% tolerance standard "mechanically." It
would assess a smaller disparity in light of "persuasive evidence
of systematic exclusion."  438 Mass at 566.  But the SJC failed to
fairly credit Petitioner's evidence of systematic exclusion
embedded in the census system that forms the foundation for the
"one-day one-trial" system employed in Massachusetts.[8]

Exclusion is systematic when it is inherent in the process

---

[8]

The SJC examined some of Petitioner's preliminary evidence in
concluding that it was inadequate to carry his burden on the merits
of his constitutional claim but ignored that evidence in reviewing
the denial of his discovery and evidentiary hearing requests. The
standard for permitting post-conviction discovery in Massachusetts
courts requires the defendant to make a prima facie showing on the
issue on which he seeks discovery.  Even when that hurdle has been
cleared, "discovery is within the judge's broad discretion."
<u>Arriaga</u>, 438 Mass at 569-570.

used for jury composition.  <u>Duren</u>, 439 U.S. at 366.  The court dismissed Petitioner's evidence that "census collection procedures [in the cities in which 89.3% of Essex County's Hispanic population lives] may not fully identify all residents who are potentially available for jury duty" because "the defendants have not demonstrated that these practices resulted in systematic exclusion of Hispanics from the jury pools in Essex County as a whole."  It did not acknowledge Prof. Sutton's preliminary evidence demonstrating that specific census tracts within these cities showed distinct patterns of exclusion, SA, Doc. 2:153, nor that Petitioner had been deprived of the means necessary to make the showing that the Court was requiring of him.  Throughout, the state courts conflated the state law "prima facie" standard for discovery and evidentiary hearing with the "prima facie" standard defining the defendant's burden of proof on the merits.  This was unreasonable in view of the evidence before the Court and involved an unreasonable application of established Federal law.  <u>Norton</u>, supra.

Given the state courts' unreasonable application of federal law to Petitioner's case and the fact that further fact development is necessary to fully present Petitioner's Claim One for habeas review, <u>Blackledge v. Allison</u>, 438 U.S. 63, 82-83 (1977), Respondent's motion to dismiss Claim One is premature and should be denied.

II.  <u>Respondent's Motion To Dismiss Claim Two Is Premature</u>.

Petitioner's right to equal protection of the laws, to due process of law and to meaningful access to the courts was violated because [1] state officials failed to require prospective jurors to state their racial or ethnic identity or otherwise collect the information needed to determine whether the jury composition and selection system was actually providing a fair cross-section in the source bodies from which Petitioner's jury was chosen; [2] denied to Petitioner, who was indigent, the information and financial resources he needed to independently obtain the information necessary to litigate his federal constitutional fair cross-section claim in his direct appeal of his conviction; and [3] refused to accept Petitioner's substantial preliminary data as reliable for the limited purpose of ruling on his motions for the discovery and financial assistance he needed to fairly litigate his federal constitutional claim.  As a consequence, Petitioner was completely foreclosed from presenting any evidence to support his claim that African Americans were systematically underrepresented in the source bodies and he was prevented from meeting the state evidentiary standards imposed on his discovery and financial assistance requests.

The state court's ruling that the Spanish surnames system is unreliable was contrary to, or involved an unreasonable application of, the Supreme Court's holdings in <u>Hernandez v. Texas</u>, 347 U.S.

475 (1954) and <u>Castaneda v. Partida</u>, 430 U.S. 482 (1977) that the Spanish Surnames system is a valid method of identifying Hispanic individuals. The state court ruled that Petitioner was required to obtain the numbered resident list that each city and town submits to the jury commissioner and the jury commissioner's randomly generated prospective jury list which, according to state law, are available to the public upon request. The state court overlooked Petitioner's proof that he requested and was denied this information. The state court also ruled that Petitioner was required to contact individual prospective jurors over an extended period to determine their ethnicity and race, overlooking the fact that Petitioner was and is indigent and was denied all funding requests.

The violation of three constitutional protections is asserted in respect to different aspects of the Commonwealth of Massachusett's [hereinafter "state"] active and passive obstruction of Petitioner's efforts to present his fair cross section claims. Respondent argues that this claim "sounds purely in state law" [MTD Memo, 18-19] because it involved application of a state statute. Respondent argues that the State had no constitutional obligation to obtain the information needed to establish the ethnic or racial composition of the venires from which Petitioner's trial jury was drawn [MTD Memo, 22]; and that Petitioner had no constitutional right to financial assistance in presenting and preparing his fair

cross section claim because his first request was made in a post-conviction proceeding. Respondent argues that Petitioner's asserted right of access to the Jury Commissioner's records to obtain the data needed to prepare and present his fair cross-section claim would not have produced reliable evidence. MTD Memo, 18-22.

Petitioner's claims are, as indicated, predicated on the equal protection, due process and right of access to courts protections guaranteed by the federal constitution. Respondent's posits that these guarantees did not apply to Petitioner's motion for a new trial, citing and quoting Ross v. Moffitt, 417 U.S. 600, 609-616 (1974) and Dirring v. United States, 353 F.2d 519, 520 (1st Cir. 1965). From that premise she argues that, given the post-conviction context of these rulings, the application of the statute involves only questions of state law. This is incorrect for two reasons.

First, these particular post-conviction motions were made as part of Petitioner's direct appeal, and that determination is a matter of federal law. Second, even if they were strictly post-conviction, principles of equal protection, due process and access to the courts are applicable. Thus, this is one of the circumstances in which the application of state law has federal constitutional impact, and claims so founded are cognizable in habeas corpus:

"Federal habeas corpus relief cannot be granted merely because
a state court errs in its application of state law.  But a
state law or practice that betrays a fundamental principle of
justice offends the Due Process Clause.  Thus, a state court's
error in applying a state rule sometimes can have
constitutional implications.  That, in turn, may afford a
basis for federal habeas relief."

Sanna v. DiPaolo, 265 F3d 1, 11-12 (1st Cir. 2001).

Further, neither Ross nor Dirring have the impact attributed
to them by Respondent.  Ross held that the federal constitution
does not require appointment of counsel proceedings which
constitute discretionary appeals of convictions; Dirring held that
counsel was not constitutionally required in collateral attacks on
convictions.  Id.  Respondent has not addressed the possibility
that Petitioner's motion for a new trial was part of his direct
appeal.  This is precisely the case.

Whether federal law applies to a state post-trial proceeding
is a question of federal constitutional law, not state law.  Lopez
v. Wilson, 426 F3d 339, 351 (6th Cir. 2005).  In Evitts v. Lucey,
469 U.S. 387 (1985) the Supreme Court  addressed this issue,
explaining and applying Ross.  Ross applies to cases in which the
defendant has earlier had "an adequate opportunity to present his
claims fairly in the context of the State's appellate process."
Evitts, 469 U.S. at 402.

As Respondent described in her memorandum, Petitioner here
filed his motions for funds and access to the Jury Commissioner's
records while his direct appeal was pending.  This procedure had

been specifically approved for developing the factual record for fair cross section claims in cases in which that had not been done before trial. <u>Commonwealth v. Gaskins</u>, 419 Mass 809 (1995). The motions were filed in the SJC, where the direct appeal was to be heard, and remanded by a single justice of that court to the trial court for consideration. Petitioner's appeal of the denial of those motions by the trial court was consolidated with the appeal as of right granted him by M.G.L. c. 278 §33E. The present Massachusetts Rules of Appellate Procedure now institutionalize what at the time of Petitioner's appeal was a common practice. M.R.A.P., Rule 19(d).[9] See, <u>Commonwealth v. Randolph [II]</u>, 438 Mass 290, 297 (2002)[Noting the practice of filing pre-appeal motions as part of direct appeal and applying different standards of review to pre- and post-appeal motions for new trial in first degree murder cases]; <u>Commonwealth v. Randolph [I]</u>, 415 Mass 364, 367-368 (1993) [Ruling on direct appeal and preappeal motion for new trial in same proceeding and applying more favorable M.G.L. c. 278, §33E standard to all issues].

As <u>Lopez</u> notes, state law is informative but the question of whether a particular proceeding was a direct appeal is a question

---

[9] "(1) In the case of a direct appeal by an appellant who has been convicted of first degree murder, the appellant shall, within one hundred and twenty days after the date on which the appeal is docketed in the Supreme Judicial Court (1) serve and file the appellant's brief; (2) serve and file a motion for new trial; or (3) for good cause shown, seek a further enlargement."

of federal law.  Application of <u>Evitts</u> and <u>Halbert v. Michigan</u>, 545 U.S. 605, 125 S.Ct. 2582 (2005) establishes that Petitioner's motions for funds and for access to the Jury Commissioner's data were part of his direct appeal and he was thus entitled to the equal protection and due process protections afforded by <u>Douglas v. California</u>, 372 U.S. 353 (1963) and <u>Griffin v. Illinois</u>, 351 U.S. 12 (1956).  In addition, even if Respondent were correct that Petitioner's motions were part of a collateral challenge to his conviction, she has failed to address Petitioner's argument that due process and equal protection principles still required the State to provide the funds and access to information he requested.

    <u>Halbert</u> and <u>Evitts</u> confirm that, under <u>Douglas</u> and <u>Ross</u>, Petitioner's motion for new trial requests for funds and data were part of a first tier appeal or the functional equivalent.  First, the function of the proceeding in question was correction of errors.  <u>Halbert</u>, 125 S.Ct. at 2590-2592; <u>Evitts</u>, 469 U.S. at 402. At the preappeal motion for new trial stage, the appellant is engaged in making a factual record for appellate review in the first instance.  See <u>Halbert</u> at 2592.  Second, in an appeal as of right, the defendant "has not previously had 'an adequate opportunity to present his claims fairly in the context of the State's appellate process.'" Petitioner's trial counsel had not adequately made the factual record for litigating an effective fair cross section claim and Petitioner's pre-appeal motions were the

23

approved way of making that record.  <u>Gaskins</u>, supra.

Even viewed as post-conviction collateral proceedings, Petitioner's motions were subject to the guarantees of due process, equal protection and meaningful access to the courts. In <u>Smith v. Bennett</u>, 365 U.S. 708, 713-714 (1961) the Court held that these principles apply to postconviction proceedings.  In fact, the SJC acknowledged years ago that the Transcript Cases guarantee that "indigents have an adequate opportunity to present their claims fairly within the adversary system." <u>Blazo v. Superior Court</u>, 366 Mass 141, 143 (1974).

In <u>Smith</u> the Court invalidated an Iowa requirement that petitioners for a state writ of habeas corpus pay a $4.00 filing fee.  The state proceeding was a collateral attack on convictions, available as a postconviction remedy to a petitioner who could pay the filing fee.  The issue decided in the negative was: "Since Iowa does make the writ available to prisoners who have the $4 fee, may it constitutionally preclude its use by those who do not?"  365 U.S. at 711.  Extolling the virtues of habeas corpus, the Court said: "When an equivalent right is granted by the State, financial hurdles must not be permitted to condition its exercise." Id., at 713.  Acknowledging that the State was not obligated to provide for habeas corpus relief, the Court said:

> "Because Iowa has established such a procedure, we need consider neither the issue raised by petitioners that the State is constitutionally required to provide some type of post-conviction remedy for the vindication of federal rights,

> nor the State's converse claim that the remedy is a matter of legislative grace.  However, the operation of the statutes under attack has, perhaps inadvertently, made it available only to those persons who can pay the necessary filing fees. This is what it cannot do."

Id., at 713-714.  The Bennett Court's rationale was grounded

directly on Griffin v. Illinois, supra, in which the Court held that

a state must furnish a trial transcript to an indigent appellant

where a transcript is essential to an effective appeal. See, Britt

v. North Carolina, 404 U.S. 226, 227 (1971) [applying Griffin to an

indigent defendant's request for a free transcript of first trial,

which ended in a mistrial, to help defend in second trial].  Thus

the equal protection and due process principles both prohibit, in

state post-conviction proceedings, the imposition of financial

obstacles such as filing fees and require the expenditure of state

funds, as in procuring transcripts.  Acknowledging that appellate

review is not constitutionally required, the Griffin Court said:

> "Appellate review has now become an integral part of the Illinois trial system for finally adjudicating the guilt or innocence of a defendant.  Consequently at all stages of the proceedings the Due Process and Equal Protection Clauses protect persons like Petitioner from invidious discriminations."

351 U.S. at 18.  A little more eloquently, Justice Frankfurter

elaborated in concurring:

> "But when a State deems it wise and just that convictions be susceptible to review by an appellate court, it cannot by force of its exactions draw a line which precludes convicted indigent persons, forsooth erroneously convicted, from securing such a review merely by disabling them from bringing to the notice of an appellate tribunal errors of the trial court which would upset the conviction were practical

> opportunity for review not foreclosed.
>
> To sanction such a ruthless consequence, inevitably resulting from a money hurdle erected by a State, would justify a latter-day Anatole France to add one more item to his ironic comments on the 'majestic equality' of the law. 'The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread.' (John Cournos, A Modern Plutarch, p. 27.)"

351 U.S. at 23. In its per curiam opinion in <u>Roberts v. LaVallee</u>, 389 U.S. 40, 42 (1967), the Supreme Court summarized its holdings on this issue:

> "Our decisions for more than a decade now have made clear that differences in access to the instruments needed to vindicate legal rights, when based upon the financial situation of the defendant, are repugnant to the Constitution. See, e.g., Draper v. Washington, 372 U.S. 487 (1963); Griffin v. Illinois, 351 U.S. 12 (1956). Only last Term in Long v. District Court of Iowa, 385 U.S. 192 (1966), we reiterated the statement first made in Smith v. Bennett, 365 U.S. 708, 709 (1961), that "to interpose any financial consideration between an indigent prisoner of the State and his exercise of a state right to sue for his liberty is to deny that prisoner the equal protection of the laws."

Plainly, then, Respondent's argument that the interpretation of M.G.L. c. 261 §27C to deny the financial assistance Petitioner requested to hire experts to help him develop and present evidence to support his fair cross section claim involves only a question of state law flies in the face of long-standing Supreme Court holdings and so involves an unreasonable application of established federal law.

Procedural due process principles lead to the same conclusion. In <u>Ake v. Oklahoma</u>, 470 U.S. 68, 76 (1985) the Supreme Court held that "the Fourteenth Amendment's due process guarantee of

fundamental fairness" requires the state to provide defendants with the resources necessary to a fair opportunity to present their defense, including hiring experts.  Although <u>Ake</u> addresses trial rights, the Court employed the general due process analysis of <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976) under which three factors are evaluated in determining what process is due in the particular proceeding in question, and so applies to post-conviction proceedings as well.

Each of these <u>Mathews</u> factors supports Petitioner's claimed right to the provision of access to evidence and financial assistance in the state post-trial proceedings.  First, Petitioner had a compelling interest in having his constitutional claims fully presented and fairly adjudicated.  A primary purpose of post-conviction proceedings is to "give one whom [the state] deprives of his freedom the opportunity to open an inquiry into the intrinsic fairness of a criminal process, <u>Carter v. Illinois</u>, 329 U.S. 173, 174 (1946); Petitioner's liberty was at stake.  He had "much at stake in proving that his jury was improperly constituted due to an equal protection [or due process] violation, for we have recognized that discrimination in the jury selection process may lead to a reversal of a conviction." <u>Powers v. Ohio</u>, 499 U.S. 400, 414 (1991).  Second, the governmental interest adversely affected by the provision of expert assistance was money, which is generally held to be of secondary rank compared to the enforcement of

27

constitutional rights.  <u>Bounds v. Smith</u>, 430 U.S.  817, 825 (1977) [The "cost of protecting a constitutional right cannot justify its total denial"]; <u>Smith v. Bennett</u>, 365 U.S. at 713 ["Financial hurdles must not be permitted to condition its (the writ of habeas corpus) exercise."].  The third <u>Ake</u> factor is the value of the procedural safeguard and the risk of erroneous deprivation of the affected interest without it.  The value of the jury commissioner's data and expert assistance was that they would enhance the reliability of the postconviction and appellate review of Petitioner's constitutional claims.  Balancing these factors in Petitioner's case leads to the conclusion that due process required that he be provided with both access to the jury commissioner's data and the funds to hire experts to interpret and present the facts to the court.

    Finally, Petitioner had a federal constitutional right to meaningful access to the Massachusetts post-conviction process. <u>Bounds v. Smith</u>, 430 U.S. at 825 [due process right to "reasonably adequate opportunity to present claimed violations of fundamental rights to the courts."]; Accord, <u>Lewis v. Casey</u>, 518 U.S. 343, 350 (1996).  The "right of access to the courts . . . is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights."  <u>Wolff v. McDonnell</u>, 418 U.S. 539, 579 (1974). "To be meaningful, the right

of access to the courts must include the means to frame and present legal issues and relevant facts effectively for judicial consideration." Battle v. Anderson, 376 F. Supp. 402, 426 (E.D. Okla. 1974). Where the evidence cannot be effectively presented without expert assistance, it must be provided. Ake, 470 U.S. at 76. Delgado was deprived of both the jury commissioner's data needed to substantiate his jury composition claims and the expert assistance needed to develop and present the evidence.

Respondent argues that Petitioner's claim that the State violated his right to due process by failing to require prospective jurors to state their racial or ethnic identities should be rejected because he did not cite a Supreme Court decision holding to that effect. Respondent also argues that the state courts' refusals to require the Jury Commissioner to provide Petitioner the names and addresses of the prospective jurors was not error because the Spanish Surnames method of identifying Hispanic individuals is not reliable. Neither argument is viable.

In Arriaga, the SJC expressed its view that the most reliable method of determining ethnic group membership is to ask the individual. Arriaga, 438 Mass at 571.[10] Before that decision,

---

[10]"Self-identification is the most commonsense method for determining the ethnic and racial composition of the jury venire, but our current method of asking for mere voluntary disclosure of this information fails to compile the information we need to assess the issue of underrepresentation."
The SJC never addressed the unreasonableness of imposing on the indigent Mr. Delgado the burden of developing and presenting

jurors had been asked to volunteer that information, a measure
which the SJC admitted was inadequate.  During jury selection, the
defendants jointly made a belated effort to obtain whatever racial
or ethnic self-identification had been written on the jurors'
questionnaires.  Tr.3:174-175.  The trial judge told them that, in
keeping with the Jury Commissioners' policy, the questionnaires of
the jurors who had already been voir dired had been destroyed, but
said she would arrange for the preservation of the remaining
questionnaires.  Tr.4:12.  There is no indication in the record
that they were.  Consequently, no contemporaneous record was made
of this information.  After trial, only two possible methods of
reconstructing the ethnic and racial composition of the jury were
available; each would have been expensive and time-consuming.
Given the names and addresses of the jurors, Petitioner could have
contacted them individually and asked each juror what ethnic or
racial category he or she believed he or she belonged in.  See,
Commonwealth v. Aponte, 391 Mass 494, 496 n. 3, 497 (1984) [a
public defender's office carried out similar research of an Essex
County grand jury venire in which there were no Hispanics].  Or,
given the names of the jurors, Petitioner could have used the
Spanish Surnames method of estimating the Hispanic element of the
venires by comparing the names in the venires to the Census
Bureau's list and applying statistical methods to extrapolate that

---

"the information we need" in the circumstances of his case.

figure.  The state courts denied Petitioner the financial resources and the information needed to present his claim in either way.

In principle this passive and active obstruction cannot be distinguished from the actions of the states in the Transcript Cases, which, as the Supreme Court later explained in <u>Evitts</u>, involved a confluence of the Equal Protection and Due Process Clauses.

> "The lesson of our cases, as we pointed out in Ross, supra, at 609, is that each Clause triggers a distinct inquiry: "'Due Process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated." 'Equal Protection,' on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable.'" In cases like Griffin and Douglas due process concerns were involved because the States involved had set up a system of appeals as of right but had refused to offer each defendant a fair opportunity to obtain an adjudication on the merits of his appeal.  Equal protection concerns were involved because the State treated a class of defendants – indigent ones – differently for purposes of offering them a meaningful appeal.  Both of these concerns were implicated in the Griffin and Douglas cases and both Clauses supported the decisions reached by this Court."

<u>Evitts</u>, 469 U.S. at 405.  Whether the essential resource being withheld from the indigent defendant is counsel, transcripts or evidence, the deprivation at bottom is of "a fair opportunity to obtain an adjudication on the merits of his appeal."  Here, the information needed to secure the evidence in support of Petitioner's fair cross-section claim was the names and addresses of the prospective jurors, and the resources to obtain their self-reported racial or ethnic identities; or the names and resources to

employ the Spanish Surnames method of estimating Hispanic membership in the venires.

The reliability of the Spanish Surnames list as a device for indirectly identifying members of this distinctive group, widely utilized by demographers, is a question of fact which the state courts did not address as such. Delgado presented significant expert opinion evidence that use of the Spanish surnames for the purposes for which he offered produces reasonably reliable data. D.A:50-111. The SJC's holding to the contrary is a legal conclusion unsupported by evidence. Arriaga, 438 Mass at 563-564.

Like many devices, it's suitability depends upon the nature and purpose of the inquiry. Here, the question is the adequacy of Delgado's preliminary showing of substantial under representation of Hispanics in the venires from which his grand and trial juries were selected, in view of the fact that the Commonwealth failed to collect contemporaneous data and has refused to make state census data available.[11]

In Hernandez v. Texas, 347 U.S. 475, 480 n. 12 (1954) the Supreme Court expressly rejected the claim that Spanish surnames do not identify a cognizable group:

---

[11]

No foolproof method of identifying members of a racial or ethnic group has been developed. The most common seems to be self-identification by individuals, Commonwealth v. Aponte, 391 Mass 494, 496 n. 3, 497 (1984), a method which is self-evidently not perfectly reliable.

> "The State challenges any reliance on names as showing the descent of persons in the County. However, just as persons of a different race are distinguishable by color, these Spanish names provide ready identification of the members of this class."

The high court reaffirmed this ruling in <u>Partida v. Castenada</u>, 430 U.S. 482, 486-87 (1977): "For our purposes, the terms 'Spanish - surnamed and 'Mexican-American' are used as synonyms for the census designation 'Persons of Spanish Language or Spanish Surname." 430 U.S. at 486 n. 5. The Court held that automatically eliminating persons from grand jury service on the basis of the "readily identifiable" characteristic of having a Spanish surname unconstitutionally discriminated against Mexican-Americans in the Texas county in question. 430 U.S. at 496-499.

In <u>People v. Trevino</u>, 704 P2d 719 (Cal. 1985), *disapproved on other grounds*, <u>People v. Johnson</u>, 767 P2d 1047, 1057 (1989) the California Supreme Court followed <u>Hernandez</u> and <u>Partida</u> after a thorough discussion of fundamental importance of the constitutional policies and the difficulties of statistical precision in identifying ethnic group members involved. 704 P2d at 727-730. The court noted that the Bureau of the Census and the Equal Employment Opportunity Commission both compile and publish their data based on Spanish surnames identification: "It demonstrates a broader understanding that individuals bearing those names represent a discrete segment of the population based on ethnic commonality." The court held:

> "Spanish surnames identify Hispanics, a cognizable class. Although the correlation between surname and group membership is not exact, such precision is unnecessary. Where, as here, no one knows at the time of a challenge whether a particular individual who has a Spanish surname is Hispanic, a showing that jurors are being excluded on the basis of surname alone constitutes a prima facie case of exclusion of a cognizable class."

704 P2d at 729. The court also held that a more stringent requirement would "place an unwarranted and impractical burden on the defendant's ability to preserve his representative cross-section rights" and pointed out that, in Tulare County, all of the Spanish origin group identified themselves as Mexican, Puerto Rican, Cuban or "other Spanish/Hispanic."[12]  704 P2d at 730 & n.19.

The Colorado Supreme Court has also held that Spanish surnamed people clearly constitute a cognizable group. Fields v. People, 732 P2d 1145, 1153 (1987). See also, United States v. Gerena, 677 F. Supp. 1266, 1270 (D.Ct. 1987); United States v. Hunt, 265 F. Supp. 178, 187-190 (W.D. Tx.1967).

One of the most obnoxious and invidious features of the state courts' rulings in this case is the Catch-22 quality of them. The Supreme Judicial Court acknowledged that the Jury Commissioner,

---

[12] Earlier, the court observed that federal census statistics "demonstrate a strong correlation between Spanish surname and origin, and suggest that the Spanish surname category may actually be *underinclusive* in terms of identifying those of Spanish origin within a given community." 704 P2d at 727 n. 15. Since federal census figures are derived by the same method, the underinclusiveness of the method should have no significant impact on the ratio established by comparing the two.

whose office is located in its own bureaucracy and is subject to its orders, had never required prospective jurors to report their membership in racial or ethnic groups [the most reliable of available methods of making this determination] nor developed any other method of determining whether its jury-constructive system actually generated source bodies which met federal constitutional standards. It acknowledged that the Jury Commissioner and the Superior Court had refused to furnish to Petitioner the information he needed to develop evidence to support his fair cross section claim. It held that Petitioner nonetheless not been denied the opportunity to present his claim because he was statutorily entitled [M.G.L. c. 234A §15] to the lists of prospective jurors sent by the towns and cities to the Jury Commissioner, and that he could somehow have made use of those lists to compile his evidence. _Arriaga_, at 572. Never mind that Petitioner was indigent and had been denied funds to hire the human resources he would need to trace and identify the racial or ethnic group membership of these individuals. Never mind that in rejecting the Spanish Surnames method of identification as unreliable, the SJC had reduced Petitioner to the one possible method – communication with individual venirepersons – which was also the most expensive and time-consuming. The SJC ignored Petitioner's unrebutted evidence that he made a written request for those very lists without receiving a response from the Jury Commissioner. Exhibit A. Every potential avenue by which

Petitioner might have developed an evidentiary basis for his fair cross-section claim was denied him.

In these ways, the State violated Petitioner's rights to equal protection, to due process and to meaningful access to the courts. The SJC's ruling upholding this course of action involved an unreasonable application of clearly established federal law.

Respondent's motion to dismiss should be denied because she has failed to establish that Petitioner's Claim Two fails to state a claim on which relief might be granted. As with Claim One, the motion is misplaced because development of the facts in this habeas corpus proceeding may well establish a factual basis for relief on one or more of the grounds asserted in Claim Two.

III. <u>Trial Counsel's Failure To Preserve Petitioner's Jury Instruction Issues Constituted Ineffective Assistance Of Counsel</u>.

Without addressing the substance of Petitioner's instructional error claim, Respondent argues that it was procedurally defaulted and that the procedural default constitutes an independent and adequate state ground for judgment on that issue. She seeks to refute Petitioner's claim that cause and prejudice excusing his default are established by ineffective assistance of counsel in failing to preserve his appellate rights with regard to this error with an assertion that the SJC found that the instruction was correct. Petitioner does not dispute whether the instruction conveyed state law principles correctly; he asserts that it violated his right to due process of law by reducing the prosecution's

36

federal due process-mandated burden of proof.

    A.  The Accessory Instructions Imported An Overly Broad
Definition Of Malice Aforethought.

    In Massachusetts law, malice aforethought is the element which
makes an unlawful homicide murder. Commonwealth v. Webster, 59
Mass (5 Cush.) 295, 304 (1850). Malice aforethought can be proved
by evidence of (1) intent to kill, (2) intent to inflict serious
bodily harm, or (3) intentional commission of an act which creates
a plain and obvious likelihood of death, where the defendant acts
with conscious disregard toward that risk [the latter will be
referred to herein as "third prong" malice]. Commonwealth v. Moore,
408 Mass 117, 134 n. 9 (1990). Petitioner was convicted of first
degree murder by deliberate premeditation, which requires a finding
of malice in the form of intent to kill and of first degree murder
by reason of extreme atrocity or cruelty, which can be based on any
of these three forms of malice.

    The jury instructions in Petitioner's trial told the jury that
malice included anger, hatred and revenge, and "every other unlawful
and justifiable...[or] purposeful, selfish wrongful motive...."
T.XI:163-164. This broader definition was disapproved in
Commonwealth v. Eagles, 419 Mass 825, 836 (1995), after Petitioner's
trial. He would have been entitled to the benefit of this rule on
appeal had his counsel preserved the issue for review. Griffin v.
Kentucky, 479 U.S. 314, 320-328 (1987).

    The rationale of Eagles included the observation that this

37

definition "may lead the jury to believe that anger, hatred, revenge or a selfish, wrongful mood is enough to show malice." 419 Mass at 836. That is, the jury was permitted to find malice without finding facts necessary to satisfy the state law definition of that element. That was a serious risk in Petitioner's case because he was not present at the killing and disclaimed any intent to participate in anything other than a beating, while admitting that the "mission" was to avenge Esteras' disrespect to the Latin Kings. Under the instruction given, even if this testimony created a reasonable doubt that he acted with actual malice, the jury could still have found malice under the expanded definition.

This instruction relieved the Commonwealth of the burden of proving an essential element of the crime charged. Neder v. United States, 527 U.S. 1, 9 (1999).

Because Petitioner was neither the shooter nor present at the scene, the possibility that one of the jurors fell back on this enlarged definition in finding malice on his part cannot be ignored. The jury was permitted to find malice solely on proof that Petitioner acted on anger, hatred, revenge or some other unlawful and unjustifiable or purposeful, selfish, wrongful motive.

In short, this instruction permitted Petitioner's conviction of murder on a finding that he participated in an unlawful homicide while motivated by anger, revenge or a desire for respect for the Latin Kings, without a finding of malice aforethought as defined by

Masachusetts law.   These instructions violated his right to due process of law.  <u>Neder</u>, supra.

A finding of prejudice is compelled under the <u>Brecht</u> habeas corpus review standard, in which the Respondent has the burden of establishing harmlessness.  <u>O'Neal v. McAninch</u>, 513 U.S. 432, 437-438 (1995).[13]   The standard is taken from <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946):

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand. . . .  But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected."

328 U.S. at 764-765.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993). Respondent has made no argument on this point, so her motion to dismiss is unsupported in this respect and must be denied.

IV.  <u>The Prosecutor Presented False Evidence Regarding The Terms Of Maria Mercado's Rewarded Testimony Agreement And Withheld The Fact That Truthful Testimony Was Not Actually Required Of Her</u>.

Maria Mercado testified in Petitioner's trial and in the trial of his codefendant Hugo Morales under a single reward-for-testimony-and-cooperation agreement with the prosecution.  The key stipulation in the agreement, presented with much fanfare to the jury, was that her testimony be truthful.  She lied in Petitioner's trial, and her testimony in Morales' trial was so egregiously false that the case

---

[13]Justice Stevens' concurrence in <u>Brecht</u> commanded a majority of the Court on this point. <u>O'Neal</u>, 513 U.S. at 439.

was compromised for a suspended sentence.  Ms. Mercado nevertheless received her full reward.  His post-trial discovery of these events prompted Petitioner to amend his motion for new trial to assert that the information given to his jury regarding Ms. Mercado's obligation to be truthful was false or misleading, and that the true terms of her agreement had been withheld from him before and during his trial.  He has reasserted this claim in these habeas proceedings.

Respondent's main attack on this claim is that it is foreclosed by state court findings of fact to which federal deference is owed. This is not the case, as comparison of the state courts' dismissive rulings to the evidence in the record demonstrates.  No state court findings were made which meet the criteria of §2254(d)(1).

A. <u>The State Courts Findings Of Fact Are Contradicted By The Record Evidence</u>.

The state court finding touted by Respondent was made by the Superior Court judge on Mr. Delgado's motion for new trial: "There is nothing in the record that would in anyway (sic) reasonably support such a grave accusation [that the Commonwealth had a private agreement to treat Ms. Mercado leniently even if she gave perjured testimony]."  This is a limited finding of fact which is demonstrably incorrect.  However, the substance of the factual statement is distorted by the courts' revision of Mr. Delgado's actual claim.

The Supreme Judicial Court dealt with this issue in a single paragraph:

"C.    Testimony of Maria Mercado.  Delgado maintains that
he was not informed of the true terms of Maria Mercado's plea
agreement  with  the  Commonwealth,  that  Mercado  perjured
herself, and the Commonwealth still honored its agreement with
her and did not prosecute her for her perjury.  He claims that
the Commonwealth's failure to disclose the true elements of
its agreement with Mercado, that she was not required to tell
the  truth,  deprived  him  of  his  rights.   We  reject  the
defendant's  arguments  for  the  same  reasons  as  the  motion
judge; they are without merit.  The judge's rulings as to
these issues did not involve any abuse of discretion and they
do not give rise to a substantial likelihood of a miscarriage
of justice.  See *Commonwealth v. Jervis, 368 Mass 638, 647,
335 N.E.2d 356 (1975)*."

Commonwealth v. Arriaga, 438 Mass at 580.  Thus the characterized

Mr. Delgado's claim in the state courts as being that "he was not

informed of the true terms of Maria Mercado's plea agreement with

the  Commonwealth,  that  Mercado  perjured  herself,  and  the

Commonwealth still honored its agreement with her and did not

prosecute her for perjury."  It adopted the motion judge's assertion

that "There is nothing in the record that would in anyway (sic)

reasonably support [these claims]."  Neither this nor the SJC's

finding to the same effect is entitled to deference because both are

contradicted by the record evidence.   Norton v. Spencer, supra.

Neither state court performed any legal analysis of any of these

claims.

    1.  The Record Evidence Fully Supports Mr. Delgado's Claims And
Refutes The State Courts' Conclusions.

    **Ms. Mercado Testified Falsely In Petitioner's Trial.**  On direct

examination in Mr. Delgado's trial, the prosecutor closed Ms.

Mercado's testimony by eliciting that she received protection for

her children and that she would receive some unspecified consideration for her "true testimony." Tr.VIII:192-193.

Under cross examination by Delgado's counsel, Mercado denied having been told she would receive anything for testifying against Delgado. She refused to admit any expectation of leniency, denying that she had even thought about it. Tr.VIII:277-284. She denied that her testimony against Delgado was prompted by an agreement with the prosecution, Id:277, or influenced at all by any thought of sentencing leniency. Id:281-283. Mercado acknowledged that she faced a maximum sentence of 20 years imprisonment but denied she had been offered any leniency or had given any thought to the penalties she faced. Id:281-283.

After an overnight recess, under cross examination by Arriaga's counsel, Ms. Mercado adamantly denied having discussed leniency with the District Attorney's office or the main police investigator. Id:5-6. On redirect, the prosecutor read to Ms. Mercado from a disclosure letter the prosecutor had written to defense counsel before trial, after Ms. Mercado acknowledged that she had previously seen the document[14]:

> "the Commonwealth has agreed that it will take Miss Mercado's cooperation, including her truthful testimony, into consideration in resolving the charge pending against her

---

[14]

No written agreement between Ms. Mercado and the prosecution was presented. The only documentation of the agreement in the record is a pretrial disclosure letter from the prosecutor to defense counsel, Trial Ex. 60 [attached as Exhibit B].

because of Miss Mercado's concerns about the safety of her children.

The Commonwealth agreed to, and did transport her children to a place selected by Miss Mercado where they will live in an effort to keep their location secure.

The Commonwealth has facilitated her communications with them, and their caretaker."

Id:65-66.  Ms. Mercado made no response.  The prosecutor then elicited the following:

Q: Do you have any agreement with the Commonwealth concerning what specific outcome there will be of your charge?
A: None.
Q: Do you know whether you will plead or have a trial?
A: I don't even know.
Q: Do you know whether you will be sentenced, or what your sentence will be?
A: I have no idea.

Id:66.  On recross examination by Mr. Delgado's counsel, Ms. Mercado testified:

Q: They [the prosecution] want you to testify against Mr. Delgado, right?
A: (No response)
Q: That's what you're here for; isn't it?
A: To bring justice.
Q: You know what you have to say to get the deal from the Commonwealth; right?
A: No, sir.
Q: You don't know?
A: I'm only saying the truth.
Q: Let me ask you this, Miss Mercado, do you think if you went and told Ms. Brandt; Gee, I would like to cooperate, and all the letters I have been sending are all true, that we are all innocent; do you think she would have taken care of your kids?
And do you think she would have said: "We will do something about your case?"
A: She never said she was going to do something about my case.
Q: As far as you know, you're just doing this because of the goodness of your heart, right?
A: I cannot deal with it in my conscience."
Q: You don't expect they will do anything for you with

43

this; is that right?
    A: That's correct.
    Q: You think you will probably be treated just like any
other common criminal who comes into this courthouse, right?
    A: I'm not treated any differently, sir.
    Q: You're not hoping they do you a favor in exchange for
your testimony; is that right?
    A: I never put thought into that.
    Q: It's never crossed your mind that this will help you
out; right?
    A: I need to get this out of my conscience.
    Q: Could you please answer my question.
    A: To be specific: I can't.
    Q: You can't tell me whether you ever thought about it or
not?
    A: I just need to say the truth.
    Q: That's not my question.
    My question is, have you thought about it?  Have you
thought about how this will help you?
    A: No, sir.

Id:69-71.  The prosecutor made no correction to this testimony.

These exchanges vividly illustrate the slippery utility of the vague

"consideration" arrangement the Commonwealth made with Ms. Mercado;

as the Massachusetts Appeals Court pointed out this kind of

arrangement both enhances the paid witness' credibility and at the

same time allows the prosecution to fashion a reward after the fact

tailored to reflect the actual value of the witness' testimony in

obtaining the defendant's conviction:

> "By allowing Thornton to testify without making any
> express advance promises, the Commonwealth could presumably
> craft a reward post hoc that conformed to the quality of the
> service.  This approach has the added advantage of permitting
> a prosecutor to tout the fact to the jury that no specific
> promises have been made to the witness.  Needless to say, this
> tactic provides a witness who faces pending charges with an
> even stronger motive to lie than a witness with whom a bargain
> is made before trial."

Commonwealth v. Davis, 52 Mass App Ct 75, 78 n. 7 (2001).  In short,

44

the Commonwealth's arrangement with Ms. Mercado was designed to create an incentive for her to lie while allowing her to deny any expectation of a specific reward.  In her testimony she went further and denied any expectation of any reward.

**Ms. Mercado Testified Falsely In Morales' Trial.**  Second, Ms. Mercado testified falsely in Hugo Morales' trial two weeks after Mr. Delgado's trial concluded, but this time her testimony forced ADA Brandt to inform the trial judge of the most blatant of Ms. Mercado's falsehoods.  Her testimony was given under the same agreement as was in effect for Mr. Delgado's trial. A.319-320.  The prosecutor elicited the same testimony regarding rewards: She had agreed simply to testify truthfully and had no idea what the prosecution was going to do for her in exchange. D.A. 230-231.

Both the gist and the impact of Ms. Mercado's false testimony in the Morales trial was spelled out in striking terms in Justice Sweeney's memorandum following that trial.  The memo also points out the strong overlap and similarity between the subject matter of Ms. Mercado's testimony in the Delgado and Morales trials:

> "In the Delgado and Arriaga trial, Miss Mercado testified regarding the defendants' participation in the planning and killing of Esteras.  She also testified that Hugo Morales, a member of the Latin Kings, was present at the Bancroft Street headquarters on September 13, 1992 and participated in the planning of the victim's murder.  In particular, Mercado testified that Morales directed her to keep Aracelis Torres out of the back bedroom during the planning of the killing.  Mercado testified that Morales was in the back bedroom with the defendants and the other conspirators and joint venturers throughout the planning and preparation stage of the "mission."

After the trial and convictions of Arriaga and Delgado, Hugo Morales was tried before a jury on an indictment charging him with conspiracy to murder Arnaldo Esteras. I presided over that trial. Ms. Mercado testified against Morales. Her testimony regarding Morales' involvement in the murder conspiracy was more detailed in the Morales trial than it was at the Delgado/Arriaga trial and more detailed than that provided in the statements she gave to the police.[15 not in text] Confronted with these inconsistencies by Morales' defense counsel, Ms. Mercado claimed she had provided the newly revealed details of Morales' involvement in the conspiracy to the prosecutor. The same assistant district attorney prosecuted both the Morales case and the Delgado/Arriaga cases. The prosecutor informed the court that Ms. Mercado had not told her about the newly revealed details of Morales involvement.[16 not in text] As noted earlier, while the jury who heard his case was deliberating, Morales pled guilty to the indictment and based upon an agreed recommendation of counsel, I sentenced him to a suspended term of years in state prison. As the trial judge in the Morales case, it was clear to me that the prosecutor's willingness to join in such a lenient recommendation, considering the seriousness of the conspiracy, was in large measure based on the inconsistencies between Ms. Mercado's testimony at the Morales trial regarding the extent of Morales' involvement in the conspiracy, and her statements to the police, **as well as her testimony in the Delgado/Arriaga trial regarding Morales' participation in the criminal venture.** Approximately, a week after Morales pled guilty to his participation in the conspiracy, Ms. Mercado pled guilty before me to the conspiracy indictment against her and was sentenced to an agreed recommendation to time served (485 days)."

A. 319-320 (emphasis added).[17]    The judge's reaction while the Morales trial was in progress was even more pointed. During the cross examination of Ms. Mercado, the judge said: "She's got a

---

[15]

In Delgado's trial, Mercado said it took her five days with the police to prepare her statement. Tr.IX:12.

[16]

**D.A:217E-217G.**

[17]Judge Sweeney did not impose sentence on Ms. Mercado, although she spoke to the judge who did. A.D:270.

46

different version every time she takes the witness stand."
D.A:217I. Near the close of recross examination, as defense counsel
sought to clarify what Ms. Mercado had told the prosecution team on
various occasions, the judge said: "I don't want to cut off the
recross, but this is absolutely circuitous. She's going to keep up
this nonsense continually, she is not changing. She's consistent
half the time and inconsistent half the time."[18]   Id:264.

In the Morales trial then, Ms. Mercado lied to the jury in
testifying about the events during which, she claimed, the murder
of Esteras was planned by Morales and, inter alia, Mr. Delgado. The
record establishes that she testified to new, more incriminating
details regarding Morales' role, details which she had not given

---

[18]Ms. Mercado testified that ADA Brandt had participated in
the taking of her original statements on March 5-9, 1993 and had
later reviewed all 19 single-spaced pages with her, line by line.
A.D:207. ADA Brandt also reviewed parts of her testimony in
Delgado's trial with her. Id:238. She said that, when ADA
Brandt interviewed her at the jail on Sunday, October 11, 1993,
ADA Brandt had responded to Ms. Morales' new disclosures: "Sir,
she did state I did not say that to her or that I did not say in
my statement, but also told me to tell the truth." Id:249. In a
side bar conference, ADA Brandt tried to go through these new
details seriatim, representing that, had Ms. Mercado related
those details to her on Sunday, she would have disclosed them to
the defense. Id:217G - 217I.
     Morales' lawyers rejected a stipulation proposed by the
Commonwealth and instead applied for permission to call ADA
Brandt as a defense witness to testify about her one-on-one
interviews with Ms. Mercado. D.A:156-168. The judge refused to
let the defense call the prosecutor as a defense witness but
instead instructed the jury that ADA Brandt denied that Ms.
Mercado told her of Ms. Mercado's newly remembered evidence
against Mr. Morales. Id:168. After the jury had deliberated for
several days, the case was resolved by a plea to a probationary
sentence. Id.

either in her statement to police [which was so exhaustive that it required five hours to construct], in her testimony in Mr. Delgado's trial, or in her briefing the night before with the prosecutor. Ms. Mercado had met frequently with ADA Brandt and other members of the prosecution team to review her statements and previous testimony, and to prepare for her testimony in Morales' trial. D.A:190-193, 202, 207-211, 238-240, 244-250, 261. The inference that her new incriminating details against Morales were recently contrived is strong. Confronted with the fact that these details were new, she unquestionably lied in stating that she had related that newly incriminating testimony to ADA Brandt before relating it to the jury at trial. The fact that ADA Brandt was present and obviously knew at least that the latter testimony was false did not deter Ms. Mercado. That she apparently felt free to lie about ADA Brandt to her face may have stemmed in part from the prosecutor's accepting response to Ms. Mercado's repeated, uncorrected false testimony in Mr. Delgado's trial that she had no agreement with the Commonwealth in exchange for her testimony, no arrangement to plead guilty and no expectation of sentencing leniency.[19] Ms. Mercado's recently contrived testimony in the Morales trial created such substantial problems that the prosecutor felt compelled to compromise the conspiracy to murder charge against Morales for a suspended

---

[19]Uncorrected by the prosecutor although challenged in cross examination.

48

sentence.

Two additional elements of Ms. Mercado's testimony were demonstrably false.  In Morales' trial, she denied participating in the agreement to murder Mr. Esteras, claiming instead that she was a probationary member of the Latin Kings and had no vote in the matter.  D.A:257-258.  Less than two weeks later she pleaded guilty to conspiracy to murder Esteras, admitting that she was "a member of the Latin Kings at that time and had a role in the Corona, the leadership as presidential counselor.  And in that role she gave advice to other members of the organization."  Mercado Plea Tr. 10-27-93:12.  She admitted getting a black hooded shirt for one of the assailants to wear, knowing what it was to be used for.  Id:13-14.  In Morales' trial, Ms. Mercado denied knowing what the shirt was to be used for.  D.A:116-117.  In Delgado's trial, she swore "I took out a black hooded shirt with no sleeves but it was not used."  Tr.VIII:105.  Cintron and Arriaga wore black hooded shirts when they killed Esteras.

The record facts demand a finding that Ms. Mercado's testimony in both trials contained these identifiable falsehoods which were material to her credibility.  Nevertheless, she received very substantial "consideration" for her testimony.[20]  Ms. Mercado

---

[20]

Ms. Mercado agreed to "cooperate" and to give truthful testimony. When Mr. Delgado presented this claim to the trial court in his motion for a new trial, the Commonwealth presented no evidence that her cooperation involved more than testifying or that she did

pleaded guilty to conspiracy to murder, a violation of G.L. c. 274, §7, under which she faced a maximum sentence if convicted of twenty years.  On the joint recommendation of the prosecution and Ms. Mercado's lawyer, the judge sentenced her to 485 days – roughly 16 months – time served.  Moreover, the sentence was calculated to give Ms. Mercado control over the timing of her release from jail. Mercado Sentencing Tr. 1-18-94:3-5.  The agreed sentence was in consideration of Ms. Mercado's testimony in both the Delgado and Morales trials.  D.A:166.  If she was penalized for testifying falsely in either trial, that fact was kept off the record.  She received a very generous disposition, the greatest degree of consideration the Commonwealth could give her in the circumstances, short of dismissing the indictment against her.

Thus the state court findings that there was no factual basis for Mr. Delgado's claims that Ms. Mercado was not actually required to testify truthfully to receive her reward were not supported by the record, which establishes just what Mr. Delgado has asserted.

A.  <u>The Condition In Maria Mercado's Agreement As Presented To The Delgado Jury That She Was Obligated To Give Truthful Testimony In Exchange For Sentencing Consideration Was Not Real</u>.

The plea agreement between the prosecution team and Ms. Mercado was not admissible under Massachusetts law unless it required

---

anything useful to the prosecution beyond testifying in the Delgado/Arriaga and Morales trials.  The record supports an inference that the "consideration" Ms. Mercado received was given solely in exchange for her participation in the two prosecutions.

truthful testimony from her.  Commonwealth v. Ciampa, 406 Mass 257, 261, 263 (1989).  Her testimony was not admissible if it was given pursuant to an agreement which called for her to testify to a specified version of events.  Commonwealth v. Rosado, 408 Mass 561, 565 (1990).  Her commitment to tell the truth in her testimony was a precondition to her receiving the bargained-for sentencing "consideration," to the admissibility of her testimony[21] and to the admissibility of the plea agreement.  The presentation of this kind of agreement is a thinly-veiled method of vouching for the credibility of a "rewarded" witness, one whose testimony is inherently suspect.  Banks v. Dretke, 540 U.S. 668, 701 (2004).[22] This arrangement also necessarily implies that the prosecutor is able determine whether the witness has testified truthfully and is committed to exercising that power punitively if the witness lies. As the Appeals Court observed in Davis, the devious kind of arrangement employed in Mr. Delgado's case with Ms. Mercado threatens to circumvent the defendant's ability to squarely apprise

---

[21]If her agreement was contingent on her testimony leading to an indictment or conviction, that would "presumably present too great an inducement to lie, [and] would not meet the test of fundamental fairness, and would not be admitted."  Ciampa, supra at 261 n. 5.

[22]"This Court has long recognized the 'serious questions of credibility' informers pose....  We have therefore allowed defendants 'broad latitude to probe [informants'] credibility by cross examination' and have counseled submission of the credibility issue to the jury 'with careful instructions.'" Banks, at 701.  (Citations omitted, alterations in original).

the jury of what the witness has at stake in the outcome of the trial. Commonwealth of the Northern Mariana Islands v. Bowie, 243 F3d 1109, 1124 (9th Cir. 2001)["Each contract for testimony (from an accomplice) is fraught with the real peril that the proffered testimony will not be truthful, but simply factually contrived to 'get' a target of sufficient interest to induce concessions from the government."].

The prosecutor's commitment to holding the witness to her promise of truthful testimony cannot end when the witness steps down from the stand, and her obligation to disclose the exculpatory evidence that the witness will be rewarded despite demonstrated false testimony continues after trial. See, Imbler v. Pachtman, 424 U.S. 409, 425 (1976).

Once the prosecutor has reaped the benefit of using this kind of agreement to vouch to the jury for the witness's truthfulness due process principles require that it be kept when the witness's reward is determined. This is a necessary corollary to the due process rule that the promises made, rewards given and inducements offered to a prosecution witness must be disclosed to the defense so that he can present them to the jury and demonstrate to the jury whether there is a basis for believing that the witness' testimony has been influenced by self-interest. United States v. Bagley, 473 U.S. 667,683-684 (1985); Giglio v. United States, 405 U.S. 150, 155 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959). The obligation

52

to disclose promises, rewards and inducements necessarily includes the obligation to do so fully and truthfully; the prosecutor is not permitted to hide exculpatory evidence and force the defendant to dig it out.  Banks v. Dretke, 540 U.S. at 695-696.

The witness's testimony that any consideration she might receive is conditioned on her truthful testimony becomes false if that condition is later ignored.  In fact and in effect, the prosecutor has made a deal not only with the witness, but also with the defendant's jury.  Here, Mr. Delgado's jury was deceived by the representation, sponsored by the prosecutor and made in Ms. Mercado's testimony, that she would not receive her reward if she testified falsely. It was further deceived by the prosecution's assurances – presented through Ismael Cintron's testimony – that Ms. Mercado faced loss of her deal and life imprisonment if she testified falsely.

In Delgado's trial, Ismael Cintron testified the day before Ms. Mercado did.  Under cross examination by Mr. Arriaga's counsel Cintron testified repeatedly that ADA Brandt had told him that if he was caught lying in court **he would not get his deal** and would get a life sentence consecutive to  the sentence he received for his participation in the Esteras murder.  Tr.VII:9-10, 26-28, 30-31.

The combination of Mr. Cintron's testimony and Ms. Mercado's testimony created the false impression for the jury that Ms. Mercado had two incentives not to lie: she would lose her deal for

sentencing "consideration" and would be prosecuted for perjury, facing a life sentence consecutive to the sentence she received without "consideration." The record demonstrates that in fact, neither of these disincentives actually applied to Ms. Mercado, or that, at a minimum, the prosecutor retained the discretion to overlook Ms. Mercado's violation of her agreement if her testimony assisted the Commonwealth in convicting Mr. Delgado. The precise nature of the prosecutor's agreement with Ms. Mercado is not known, but the record establishes that truthful testimony was not in fact the condition precedent to "consideration" that it was represented to Mr. Delgado's jury to be.

The original justification for permitting the "vouching" testimony that a witness' plea agreement requires her to testify truthfully is the implicit representation that the witness will lose the benefit of the agreement if she testifies falsely. United States v. Roberts, 618 F2d 530, 536 (9th Cir. 1979). Mr. Delgado's counsel and, consequently, his jury was deceived on this essential basis for assessing Ms. Mercado's credibility. Because the evidence that Ms. Mercado's agreement was not fully, truthfully disclosed was not available to his counsel until after his trial, Mr. Delgado was deprived of his right to effectively cross examine her and present his full defense. Davis v. Alaska, 415 U.S. 308, 315-316 (1974); Olden v. Kentucky, 488 U.S. 227, 232 (1988); Kyles v. Whitley, 514 U.S. 419, 442-445 (1995).

The central concern of the Confrontation Clause of the Sixth Amendment is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing before the trier of fact.  <u>Maryland v. Craig</u>, 497 U.S. 836, 845 (1990).  This is more than a physical confrontation.  "Our cases construing the clause hold that a primary interest secured by it is the right of cross-examination."  <u>Davis v. Alaska</u>, 415 U.S. at 315.  One core purpose of cross examination is to expose to the fact finder relevant and discrediting information "revealing . . . ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand," motives that cast doubt on the honesty of the witness's testimony.  <u>Id</u>., at 316.

Mr. Delgado has made a powerful showing that the Commonwealth did not keep its promise to his jury that it would reward Ms. Mercado only if she testified truthfully.  The promise was not that she would be required to give mostly truthful testimony, and it was not qualified with the reservation that lies which the prosecutor regarded as minor could be overlooked.  The Supreme Court has said:

> "It is of no consequence that the falsehood bore upon the witness' credibility rather than directly on the defendant's guilt.  A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . ."

<u>Napue</u>, 360 U.S. at 269-270.  The representation that Ms. Mercado would be rewarded for her testimony only if she was truthful was itself a lie.

Ms. Mercado's false testimony in Morales' trial is strongly relevant to Petitioner's claim. The situation is analogous to that in <u>Bracey v. Gramley</u>, 520 U.S. 899 (1997), where the petitioner relied on evidence that the judge in his trial had acted corruptly in the trials bracketing petitioner's as evidence that the judge's corruption affected his trial. The Court held that Bracey had alleged specific facts which, if true, entitled him to habeas relief. 520 U.S. at 908-909. Likewise here, evidence that Ms. Mercado violated the ostensible terms of her agreement in Morales' trial and still received her reward is relevant to Petitioner's claim that the identical terms presented to his jury were false.

The state court findings of fact to which a federal habeas court owes deference are only findings of "historical" facts which resolve a "factual issue." Under §2254(e)(1)[23], which "factual issues" are "basic, primary or historical facts: facts "in the sense of a recital of external events and the credibility of their narrators." <u>Coombs v. Maine</u>, 202 F3d 14, 18 (1st Cir. 2000). The trial/motion judge made no findings of historical fact regarding the truthfulness of the Commonwealth's disclosure of its agreement with

---

[23]"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody poursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Mercado.[24]  She said: "The written argument in support of this claim is vague and misleading.  It appears that the defendant Delgado says that the Commonwealth had a private agreement to treat Ms. Mercado leniently even if she gave perjured testimony.  There is nothing in the record that would in anyway support such a grave accusation." SA.Doc. 4, pp. 323-324.  The SJC made no findings of fact on this issue but acknowledged that the claim was "the Commonwealth's failure to disclose the true elements of its agreement with Mercado, that she was not required to tell the truth." Arriaga, 438 Mass at 580.

The state courts' findings on this issue are wholly inadequate to fairly account for the record evidence presented to them.  Like these courts, the Commonwealth's brief to the Supreme Judicial Court failed to even address this evidence beyond dismissive characterizations.  SA. Doc. 5, pp. 32-34.  It's memorandum in support of its motion to dismiss in this court likewise abjures discussion of the evidence.

Ms. Mercado testified in the Delgado and Morales trials under the same agreement, repeatedly touted to the jury as requiring her to testify truthfully in order to receive "consideration" on the conspiracy to murder charge she faced.  She repeatedly denied the

---

[24]As noted, no written agreement between Ms. Mercado and the prosecution was produced.  The evidence of that agreement was in a pretrial disclosure letter from the prosecutor to co-defendant Arriaga [Trial Ex. 60] and in Ms. Mercado's varying testimonial statements about the agreement.

existence of this agreement under oath until confronted with written evidence of it.  To the extent that false testimony was corrected, it was corrected by the defense rather than by the prosecution.  In Morales' trial, Ms. Mercado testified falsely that she had disclosed to the prosecutor the new details in her account of Morales' conduct.  The trial judge found that her false testimony so seriously damaged the prosecution's case that it was compromised on a guilty plea and suspended sentence for Morales.  Yet Ms. Mercado received a sentence to time served (485 days) on a charge for which the maximum penalty was a 20 year state prison term.

A habeas petitioner is entitled to have his constitutional claims assessed on a full factual record.  Blackledge v. Allison, supra. Where the state courts have not made specific findings which account for the record evidence, the habeas court is free to make its own findings of fact.  Snyder v. Dixon, supra.  This Court can and should find that the prosecution's presentation of its agreement with Ms. Mercado was false and that the actual agreement, that did not require truthful testimony, was suppressed to Petitioner's prejudice.

C.   The Suppressed True And Accurate Account Of The Prosecution's Agreement With Ms. Mercado Was Material.

In Kyles v. Whitley, supra, the Supreme Court held that, once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review.  514 U.S. at 435.  A finding of materiality cannot be dismissed as harmless.  The

Bagley finding, that there is

> "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, *473 U.S. at 682* (opinion of Blackmun, J.); *id., at 685* (White, J., concurring in part and concurring in judgment), necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict,'" *Brecht v. Abrahamson, 507 U.S. 619, 623, 123 L.Ed.2d 353, 113 S.Ct. 1710 (1993), quoting Kotteakos v. United States, 328 U.S. 750, 776, 90 L.Ed.2d 1557, 66 S.Ct. 1239 (1946).* * * * In sum, once there has been Bagley error as claimed in this case, it cannot subsequently be found harmless under Brecht."

Kyles, 514 U.S. at 435-436.  A showing of materiality under Bagley does not require demonstration by the defendant that "disclosure would have resulted ultimately in the defendant's acquittal" and it is not a sufficiency of the evidence test.  Kyles, supra at 434-435.  Rather:

> "Bagley's touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' *Bagley, 473 U.S. at 678.*

Kyles, supra at 434.[25]   Bagley materiality is established by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine

---

[25]In Strickler v. Greene, 527 U.S. 263, 297-301 (1999) Justice Souter, dissenting on other grounds, makes a convincing case that the term "reasonable probability" would be more accurately states as a "reasonable possibility."

confidence in the verdict." <u>Id</u>., at 435.

The undisclosed evidence is that Maria Mercado was going to plead guilty to conspiracy to murder and be sentenced to sixteen months in jail despite the fact that she had testified falsely in both Delgado's and Morales' trials, and that her mendacious and evasive testimony sabotaged the Morales prosecution.  This should have been disclosed to defense in writing before trial.  The potential value of this information to the defense before trial would have been tremendous.  Proof that Ms. Mercado was to receive this sentencing leniency for testifying against Mr. Delgado and Mr. Morales without regard for the truthfulness of her testimony would have supported a finding that the leniency was actually contingent on Mr. Delgado's and/or Mr. Morales' conviction; on this view of the matter her testimony would have been inadmissible and evidence of her correspondence with Mr. Delgado would have been limited to his letters to her.  <u>Commonwealth v. Rosado</u>, supra.  Alternatively, a document signed by ADA Brandt setting out such an agreement would have proved invaluable in both restraining and in impeaching Ms. Mercado's testimony.  She repeatedly vouched for her own truthfulness and repeatedly asserted that the prosecutor and police had told her repeatedly to be truthful in her testimony.  The prosecution would have had to forego this element of her testimony or risk devastating impeachment on this issue.  An agreement on these terms would also have served to cast serious doubt on the

60

integrity of the Commonwealth's investigation and its case in general. <u>Kyles</u>, supra at 445-449. Much had been made through Ismael Cintron of the prosecutor's threat to nullify her agreement with him and prosecute him for perjury if she caught him testifying falsely. Proof that the prosecutor had a "reward regardless" deal with Ms. Mercado would have either precluded this testimony or subjected it to ridicule. Having a disclosure of this kind of arrangement on the record would have drastically altered the prosecution's strategy in presenting the testimony of Ismael Cintron [Quest], whose complaints led to the murder, who was one of the two who confronted and killed the victim, and who testified under a "truthfulness" plea agreement to second degree murder [Tr.VII:9-10, 26-28, 30-31] and Cruz Gonzalez, who drove the car to and from the murder scene and also testified under a "truthfulness" agreement.

Ms. Mercado was a crucial witness in Delgado's trial. She claimed to have been present at the time when the local Latin Kings leadership, including Defendant Delgado, met to discuss how to deal with Cintron's confrontation and dispute with Esteras. Tr.VIII:74-75. She explained the organization's structure, ways of doing business and terminology. Id:72-79, 87-97. Mercado served as the Commonwealth witness who explained the circumstantial evidence [Id:97-101, 106-109], told the jury that Delgado had insisted that Esteras be executed, and that the written mission directive [signed by Delgado but not Morales] to "terminate" [murder] Esteras rather

than to beat him, as Delgado testified was his understanding and intention. Id:111-117.  Ms. Mercado testified that she, her cousin and Aracelis Torres were in the back room when "there was a phone call" which was taken in the living room: "And after that phone call, they hanged up, thy were all excited, and saying, 'Yes, we did it.'" Tr.VIII:117.  The prosecutor attributed this reaction to Petitioner.  Tr.XI:101.  Torres, who testified immediately before Mercado, said nothing of this event.  Tr.VIII:39-68.  The call was actually taken by Ms. Mercado's boyfriend, Hernandez.  Tr.VI:245.

The conversations on which the accessory before the fact and conspiracy charges were based were of a piece, occurring in Ms. Mercado's apartment at 95 Bancroft Street as parts of a continuous sequence of events. Mercado's testimony was indispensable to the Commonwealth's charge that Delgado was an accessory before the fact to Esteras' murder, as it was to the Commonwealth's charge that Morales was a member of a conspiracy to murder Esteras.

For these reasons, Ms. Mercado's indisputably false testimony against Morales directly implicates the integrity of her testimony against Delgado regarding the same conversations and events.

Respondent has failed to establish that Petitioner could not possibly obtain habeas relief on this claim as asserted in his petition.  In fact, the record demonstrates that Petitioner is entitled to relief on this ground.

V.     <u>Ineffective Assistance Of Counsel Can Establish Cause And
Prejudice To Excuse A Procedural Default</u>.

Petitioner claims that trial counsel was ineffective in failing
to fully document his fair cross section claim and in failing to
object to the faulty malice instruction.  Respondent invokes the
SJC's ruling that Petitioner failed to prove his fair cross section
claim as grounds for rejecting the first of these.  She argues that
the SJC rejected this claim vis-a-vis the instruction because the
instruction was found to be adequate under state law.  These
arguments do not establish that there are no circumstances under
which Petitioner could be entitled to habeas relief on either claim.

In <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984) the
Supreme Court held that "strategic choices made after thorough
investigation of law and facts relevant to plausible options are
virtually unchallengeable" because such decisions fall presumptively
within the "wide range of professional competent assistance." <u>Id</u>.,
at 690.  Jury selection took place in Essex County.  Petitioner's
trial counsel was not familiar with the demographics of that county
and did not become aware of the absence of black and Hispanic people
on the venires until the jury selection process was nearly
completed.  He did not have an office there.  His affidavit states
that he was aware of the legal and evidentiary requirements for
establishing a fair cross section claim, that he knew he did not
have adequate evidence to support the claim, and that he decided not
to ask the judge to delay the proceedings to permit him to make a

fully documented challenge to the venires.  He put together the materials he was able to muster with the assistance of the local public defender's office and made both an oral and a written objection to the inadequate representation of African Americans and Hispanics in the venires.  This decision does not meet the Strickland standard of competence because as it was not informed by adequate fact investigation.  Id.; Wiggins v. Smith, 539 U.S. 510,522-527 (2003). Whether this decision was prejudicial depends on the outcome of the investigation now being conducted by Petitioner.

The failure of trial counsel to preserve an issue for appellate review may constitute ineffective assistance of counsel.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000).  Respondents' argument that there was no state law error in the instructions fails to account for the fact that the instruction violated Petitioner's due process rights.  Ineffective assistance of counsel will excuse a procedural default in this circumstance.  Id.  Because the malice instruction violated Petitioner's due process rights trial counsel's failure to preserve this claim for appellate review constitutes "cause" and establishes "prejudice" to excuse the procedural default and open up the issue for federal habeas consideration.  Edwards, 529 U.S. at 455-459 (Breyer, J., concurring).

CONCLUSION

Because Respondent has not established, with regard to any of

64

Petitioner's five claims, that he cannot under any circumstances, obtain habeas relief, her motion to dismiss should be denied. Habeas relief should be granted on grounds three and four.

Respectfully submitted,
ALEX DELGADO, PETITIONER


By /s/ John M. Thompson
John M. Thompson
Federal Bar No. 22530
Thompson & Thompson, P.C.
1331 Main Street, Suite 320
Springfield, MA 01103
[413] 739-2100
[413] 739-2300 facsimile


Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper will copies will be sent to those indicated as non registered participants on this 7th day of November, 2006.

/s/ John M. Thompson
John M. Thompson

65