```
                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
```

ALEX DELGADO,                  )
        Petitioner     )
                       )
        v.             ) CIVIL ACTION NO. 04-30124-MAP
                       )
KATHLEEN M. DENNEHY,           )
Commissioner of                )
Corrections,                   )
        Respondent     )

```
              MEMORANDUM REGARDING
          RESPONDENT'S MOTION TO DISMISS
                  (Dkt. No. 25)

                 August 27, 2007
```

PONSOR, D.J.

## I. INTRODUCTION

Petitioner Alex Delgado, a state prisoner serving a life term for his participation in a 1992 murder, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent Kathleen M. Dennehy has moved to dismiss his petition, arguing that none of the arguments offered by Petitioner entitles him to the relief he seeks.

On March 19, 2007, this court allowed Respondent's motion. This memorandum will set forth the reasons supporting that ruling.

## II. STANDARD OF REVIEW

A. **AEDPA**.

Pursuant to the Antiterrorism and Effective Death

Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), a petition for habeas corpus may only be granted if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

According to the Supreme Court, the "contrary to" prong of § 2254(d)(1) covers instances where "a state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a [different] result." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J.). "Avoiding these pitfalls does not require" a state court to cite the controlling Supreme Court case -- "indeed, it does not even require awareness of [the controlling case], so long as neither the reasoning nor the result of the state-court decision contradicts [it]." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam); see also Bell v. Cone, 543 U.S. 447, 455 (2005).

The "unreasonable application" prong of § 2254(d)(1) is implicated whenever a state court "correctly identifies the governing legal principle from the Supreme Court's decisions but then unreasonably applies that principle to the facts of

the prisoner's case." Caputo v. Nelson, 455 F.3d 45, 49 (1st Cir. 2006) (citation omitted). In determining whether a state-court decision unreasonably applies Supreme Court precedent, "a federal habeas court should ask whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. As the First Circuit has noted, "an erroneous or incorrect application is not necessarily an unreasonable application." McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (en banc) (citation omitted).

In addition, under AEDPA, a factual determination "'made by a State court shall be presumed to be correct,' and the petitioner has 'the burden of rebutting the presumption of correctness by clear and convincing evidence.'" Obershaw v. Lanman, 453 F.3d 56, 59 (1st Cir. 2006) (quoting 28 U.S.C. § 2254(e)(1)), cert. denied, 127 S.Ct. 957 (2007). "For this purpose, 'facts' are defined as 'basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators.'" Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001) (citation omitted).

Ultimately, AEDPA's standard of review, while strict, "only applies . . . when the state court decided the federal issue." Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001),

cert. denied, 535 U.S. 1018 (2002). In cases where the state court declines or neglects to address a constitutional claim raised by a petitioner, a federal district court must review that claim de novo. Watkins v. Murphy, 292 F.3d 70, 75-76 (1st Cir. 2002).

B.  Fed. R. Civ. P. 12(b)(6).

"Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts provides that the Federal Rules of Civil Procedure apply 'to the extent that they are not inconsistent with [habeas] rules.'" Banks v. Dretke, 540 U.S. 668, 687 n.8 (2004); see also Fed. R. Civ. P. 81(a)(2).

Motions to dismiss habeas petitions pursuant to Fed. R. Civ. P. 12(b)(6) are not inconsistent with habeas rules. Thus, in ruling on a respondent's motion to dismiss for failure to state a claim upon which relief may be granted, a district court is "obliged to 'assume all facts pleaded by [the petitioner] to be true.'" Walker v. True, 399 F.3d 315, 319 (4th Cir. 2005) (Luttig, J.) (citation omitted), vacated on other grounds by 126 S.Ct. 1028 (2006).

Of course, this assumption does not apply to factual determinations made by the state courts, which are presumed to be correct absent clear and convincing evidence to the contrary.

## III. BACKGROUND

A.  The Crime.[1]

On September 13, 1992, Arnaldo Esteras, Carlos Rodriguez, and Carlos Cruz were standing on a Springfield street corner when Ismael Cintron walked by wearing his "Latin Kings" beads. Commonwealth v. Arriaga, 438 Mass. 556, 559 (2003). Esteras demanded that Cintron "[t]ake off the mother fucking beads" and "Rodriguez threatened to give Cintron an 'ass whipping'" if he did not. Id.

Cintron complied but later "reported the incident" to other Latin Kings, including Petitioner, the gang's vice-president. The leaders of the Latin Kings concluded that Esteras should be "terminated" for the insult and armed Cintron and Hector Arriaga with a gun and a knife in order to carry out their "mission." Id.

At approximately 9:15 P.M., Arriaga used the gun to shoot Esteras three times. The sixteen year-old died from these wounds in the emergency room of a Springfield hospital about fifteen minutes later. Id. at 560.

Shortly after the shooting, another Latin King named Cruz Gonzalez drove Cintron and Arriaga to Hartford,

---

[1] The following factual summary is taken from Commonwealth v. Arriaga, 438 Mass. 556 (2003), the decision by the Supreme Judicial Court of Massachusetts ("SJC") pertinent to the petition.

-5-

Connecticut, where they disposed of the gun, along with their dark, hooded sweatshirts and a stolen license plate that had been affixed to the getaway car. Id.

When several witnesses to the murder identified Cintron as a participant, Springfield police officers went to the local Latin Kings headquarters, an apartment at 95 Bancroft Street. There, they found a jacket bearing Cintron's street name and Arriaga's wallet. Id.

Gonzalez and Cintron were arrested when they returned to Springfield on the morning of September 14, 1992, and Amherst police took Petitioner into custody later that same day. The following day, Gonzalez informed law enforcement officers where they could find the stolen registration plate, the sweatshirts, and the gun. Petitioner's fingerprint eventually turned up on the registration plate. Id.

B. Pre-Trial Proceedings.[2]

On October 2, 1992, a Hampden County grand jury indicted Arriaga on one count of first degree murder and one count of conspiracy to commit murder. On January 19, 1993, it

---

[2] Petitioner maintains that Respondent's recitation of the prior proceedings in this case is, "[f]or the most part," "accurate" but "incomplete." (Dkt. No. 43, Pet'r's Mem. in Opp'n to Resp't's Mot. to Dismiss 6.)
   To the extent that factual disputes exist that were not addressed by the SJC, they have been resolved in Petitioner's favor.

charged Petitioner with being an accessory before the fact to the murder, and the two cases were subsequently joined.

Prior to Petitioner's trial, the grand jury charged a number of other individuals who participated in the decision to kill Esteras with conspiracy to commit murder. See Dkt. No. 8, Ex. 2, R. App. of Appellant Delgado on Appeal to SJC 155.) During the pre-trial phase of Petitioner's case, the Commonwealth informed Petitioner that Maria Mercado, one of the alleged conspirators, would be a witness against him and her "cooperation, including her truthful testimony," would be taken "into consideration in resolving the charge pending against her." (Dkt. No. 43, Ex. B, Letter from Laurel H. Brandt, Asst. District Att'y, to David P. Hoose, Esq., Greg T. Schubert, Esq., Terrance M. Dunphy, Esq., Richard J. Rubin, Esq., Andrew M. Klyman, Esq., and Terry Scott Nagel (May 6, 1993).)[3]

During Petitioner's pre-trial detention, the trial judge found that Petitioner "and Arriaga, along with other Latin King members, joined in an orchestrated effort to intimidate witnesses, including Maria Mercado." (Dkt. No. 8, Ex. 4, R. App. of Appellant Arriaga on Appeal to SJC 298.) As part of this campaign, Petitioner "wrote to Mercado from his jail

---

[3] As will be discussed, Mercado also agreed to testify against a co-conspirator named Hugo Morales.

cell following his arrest and in that correspondence made it clear that her children's safety was in jeopardy if she didn't remain silent about what happened." (Id. at 322-23.)

Prior to their trial, Petitioner and Arriaga moved for a change of venue due, in part, to prejudicial publicity. In response to this motion, the trial judge elected to impanel the jury in Essex County and bring the jurors to Hampden County for the trial. According to the trial judge, Petitioner and Arriaga not only consented to this arrangement but "suggested Essex County as an appropriate locus from which to choose the trial jurors" based on the fact that "the percentage of citizens of Hispanic origin or heritage in Essex County was comparable to that of Hampden County." (Id. at 289.)[4]

Jury selection began on September 7, 1993. While 350 prospective jurors were summoned each day, a large number of them did not respond and a great many others who did show up were excluded for cause.[5] Accordingly, it took four days to

---

[4] Petitioner admits that he consented to this arrangement, but argues that in moving for a change of venue, his trial counsel did not request a specific county and was unfamiliar with the demographics of Essex County.

[5] In denying Petitioner's motion for a new trial, the trial judge stated that

> Some 350 prospective jurors were summoned on the first two days of the impanelment, with between 70 and 90% actually appearing.

-8-

pick a jury of sixteen.

As this process unfolded, Petitioner's trial counsel came to believe that African American and Hispanic residents of Essex County were grossly underrepresented in the array. On September 8, 1993, he noted the dearth of nonwhite prospective jurors and lodged an objection to the array for that reason. (See Dkt. No. 29, Trial Tr. vol. 2, 164:12-166:12, Sept. 8, 1993.)

On September 10, 1993, Petitioner's trial counsel made an oral motion, pursuant to Mass. R. Crim. P. 20(a), to discharge the jury that had been impaneled on the ground that the venires from which it was selected did not represent a fair cross section of the ethnic composition of Essex County. (See Dkt. No. 31, Trial Tr. vol. 4, 201:3-

---

(Dkt. No. 8, Ex. 4, R. App. of Appellant Arriaga on Appeal to SJC 289; see also Dkt. No. 26, Resp't's Mem. in Supp. Mot. to Dismiss 6.)

However, a review of the trial transcript reveals that far fewer prospective jurors actually appeared. (See Dkt. No. 31, Trial Tr. vol. 4, 205:13-18, Sept. 10, 1993 ("The [J]ury [C]ommissioner worked with me in June in summoning in 350 people per day into this county for this trial. Between 70 to approximately 90 per day showed up."); see also Dkt. No. 29, Trial Tr. vol. 2, 166:22-167:17 ("The record will reflect I . . . made contact with the Jury Commissioner in June of this year and . . . following the standard provisions of the Jury Commissioner's Office, 350 jurors a day were called in here. Yesterday we had one hundred respond. Today we had 76 respond[] to that notification. . . . [T]he people who are responding represent probably one third of the people who were notified . . . .").)

202:22, Sept. 10, 1993.)

To establish a prima facie violation of the fair cross section requirement a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Commonwealth v. Ramos, 406 Mass. 397, 405-06 (1990) (quoting Duren v. Missouri, 439 U.S. 357, 364 (1979)).

Although he was aware of these legal standards, Petitioner's trial counsel "had neither the time nor resources . . . to undertake the investigation needed to fully document the problem, and to develop evidence that the underrepresentation of nonwhite people in the array was a systemic phenomenon."  (R. App. of Appellant Delgado on Appeal to SJC 142-43.)[6]  When the trial judge denied the Rule 20(a) motion, Petitioner's trial counsel "did not request that the trial be delayed, nor seek authorization to expend Commonwealth funds to hire an investigator and demographic expert . . . because [he] knew it would be futile given the time and resources that had gone into selecting the jury."

---

[6] Prior to the selection of the jury in this case, the SJC had held that visual observations alone were "an insufficient basis for any showing of discriminatory practices." Commonwealth v. Colon, 408 Mass. 419, 438 n.11 (1990).

(<u>Id.</u> at 144-45.)

Petitioner now contends that it would have been possible for his trial counsel to obtain jury pool records maintained by the Commonwealth's Jury Commissioner, which would have revealed the names and addresses of prospective Essex County jurors. Armed with this information and the funds to which he would have been entitled, <u>see</u> Mass. Gen. Laws Ch. 261, § 27C(4), Petitioner asserts that trial counsel could have established a <u>prima facie</u> violation of the fair cross section guarantee by contacting these individuals and asking them to identify themselves by race and ethnicity, <u>see, e.g.</u>, <u>Commonwealth v. Aponte</u>, 391 Mass. 494, 497 (1984) (using such a process to determine the racial and ethnic identities of prospective Essex County grand jurors).

C.   <u>Petitioner's Trial</u>.

Petitioner's trial began on September 13, 1993. During its case-in-chief, the Commonwealth offered the testimony of Mercado, who stated that she was present at 95 Bancroft Street when Petitioner and other Latin King leaders discussed how to respond to Cintron's confrontation with Esteras. (<u>See, e.g.</u>, Dkt. No. 35, Trial Tr. vol. 8, 99:18-23, Sept. 15, 1993 (stating that Petitioner was "very upset" and said "something had to be done").) According to Mercado, Petitioner not only insisted that Esteras be

-11-

terminated, but instructed Cintron and Arriaga on how the killing should be carried out. (See, e.g., id. 107:20-108:5.)[7]

At the close of her direct examination, Mercado explained that her cooperation agreement with the Commonwealth required her to testify truthfully and only obligated the Commonwealth to "consider" her truthful testimony when deciding how to prosecute the charge against her. (Id. 192:12-194:1.) During her cross-examination, Mercado acknowledged that the maximum penalty for conspiracy to commit murder was twenty years in state prison. (Id. 280:18-23.) However, she refused to admit that the prospect of a lengthy prison sentence motivated her decision to become a cooperating witness. (Id. 281:21-283:3.)

On redirect, the assistant district attorney asked Mercado whether she had seen the disclosure letter that had been sent to defense counsel prior to trial. Dkt. No. 36, Trial Tr. vol. 10, 65:7-10, Sept. 16, 1993; see also Letter from Laurel H. Brandt, Asst. District Attorney, to David P. Hoose, Esq., Greg T. Schubert, Esq., Terrance M. Dunphy, Esq., Richard J. Rubin, Esq., Andrew M. Klyman, Esq., &

---

[7] Mercado also testified that Hugo Morales was present at the Bancroft Street apartment and participated in the murder by instructing Mercado to keep a visitor to the apartment out of the back bedroom where leaders of the gang had congregated. (Id. 104:13-105:8.)

Terry Scott Nagel (May 6, 1993).)  After Mercado indicated that she recognized the letter, the prosecutor read the portion of it which noted the Commonwealth's agreement to take her "cooperation, including her truthful testimony, into consideration in resolving the charge pending against her."  (Id. 65:11-18.)  When the prosecutor proceeded to ask whether she had "any agreement with the Commonwealth concerning what specific outcome there will be of her charge," Mercado answered, "None."  (Dkt. No. 36, Trial Tr. vol. 10, 66:8-11, Sept. 16, 1993.)

During her recross-examination, Petitioner's trial counsel and Mercado engaged in the following exchange:

> Q: They want you to testify against [Petitioner], right?
>
> A: (No response)
>
> Q: That's what you're here for; isn't it?
>
> A: To bring justice.
>
> Q: You know what you have to say to get the deal from the Commonwealth; right?
>
> A: No, sir.
>
> Q: You don't know?
>
> A: I'm only saying the truth.
>
> Q: Let me ask you this, Miss Mercado, do you think if you went and told [the prosecutor]; Gee, I would like to cooperate, and . . . we are all innocent; do you think she would have taken care of your kids?
> And do you think she would have said: "We will

 do something about your case?"

  A: She never said she was going to do something about my case.

  Q: As far as you know, you're just doing this because of the goodness of your heart, right?

  A: I cannot deal with it in my conscience.

  Q: You don't expect they will do anything for you with this; is that right?

  A: That's correct.

  Q: You think you will probably be treated just like any other common criminal who comes into this courthouse, right?

  A: I'm not treated any differently, sir.

  Q: You're not hoping they do you a favor in exchange for your testimony; is that right?

  A: I never put thought into that.

  Q: It's never crossed your mind that this will help you out; right?

  A: I need to get this out of my conscience.

  Q: Could you please answer my question.

  A: To be specific: I can't.

  Q: You can't tell me whether you ever thought about it or not?

  A: I just need to say the truth.

  Q: That's not my question.  My question is, have you thought about it?  Have you thought about how this will help you?

  A: No, sir.

(<u>Id.</u> 68:20-71:4.)

The following day, Petitioner testified in his own defense and admitted participating in a discussion that resulted in a decision to authorize the <u>beating</u> of Esteras. (<u>See</u> Dkt. No. 37, Trial Tr. vol. 10, 51:11-52:10, Sept. 17, 1993.) According to Petitioner, Arriaga and Cintron acted independently in murdering the victim.

On September 20, 1993, the jury convicted Arriaga of murder in the first degree, and it convicted Petitioner of being an accessory before the fact to the murder.

D.   <u>The Morales' Trial</u>.

Approximately two weeks later, the Superior Court judge who presided over Petitioner's trial presided over the trial of Hugo Morales. During this trial, Mercado described Morales' involvement in the murder in much greater detail than she did during Petitioner's trial or in the statements she had previously provided to the police.  (<u>See</u> R. App. of Appellant Delgado on Appeal to SJC 167, ¶¶ 6-7.) According to the trial judge, when

> [c]onfronted with these inconsistencies by Morales' defense counsel, Ms. Mercado claimed she had provided the newly revealed details of Morales' involvement in the conspiracy to the prosecutor. The same assistant district attorney prosecuted both the Morales case and the Delgado/Arriaga cases. The prosecutor informed the court that Ms. Mercado had not told her about the newly revealed details of Morales involvement. . . . [W]hile the jury who heard his case was deliberating, Morales pled guilty to the indictment and based upon an agreed recommendation of counsel, . . . [was]

>   sentenced . . . to a suspended term . . . in state
>   prison.

(R. App. of Appellant Arriaga on Appeal to SJC 319-20.)

The trial judge concluded that the Commonwealth's support for such a lenient recommendation was due in large part to "the inconsistencies between Ms. Mercado's testimony at the Morales trial regarding the extent of Morales' involvement in the conspiracy, and her statements to the police, as well as her testimony in the Delgado/Arriaga trial regarding Morales' participation in the criminal venture." (Id. at 320.)

On January 18, 1994, Mercado pled guilty to the conspiracy indictment against her and was sentenced to an agreed recommendation of time served. (Id.)

E.   Post-Trial State Court Proceedings.

Following their convictions, both Petitioner and Arriaga obtained new counsel and filed appeals with the SJC. See Murphy v. Dennehy, No. 05-12246-DPW, 2007 WL 430754, at *1 (D. Mass. Feb. 5, 2007) (noting that all first-degree murder convictions in Massachusetts are reviewed directly by the SJC pursuant to Mass. Gen. Laws ch. 278, § 33A). While their appeals were pending, Petitioner and Arriaga filed motions for new trials, which the SJC remanded to the trial court for consideration.

Pursuant to Mass. Gen. Laws ch. 234A, § 15, the Jury

Commissioner for the Commonwealth of Massachusetts must

> make the prospective juror list of any city or town available for inspection by members of the public upon request; provided, however, that such lists shall be available only to insure the integrity of the juror selection process and the accountability of the office of jury commissioner, and that the jury commissioner shall have discretionary authority to refuse to provide such lists for commercial or research purposes.

Mass. Gen. Laws ch. 234A, § 15. Notwithstanding the plain language of this provision, the record reflects that the Jury Commissioner refused Petitioner's request for juror records relating to the selection of grand and petit juries in Hampden and Essex Counties.

On September 16, 1995, Petitioner filed a motion with the SJC seeking an order directing the Jury Commissioner to disclose this information, as well as a motion seeking funds to retain a statistician and a Hispanic linguist to review the records to determine whether Hispanic residents were underrepresented in the jury venires.[8] A single Justice of the SJC denied the motion with respect to the grand jury records and remanded the balance to the Superior Court. (R. App. of Appellant Delgado on Appeal to SJC 48-49.)

On February 8, 1996, the trial judge ruled that

---

[8] Petitioner later amended this request in order to obtain funds to hire a demographer instead of a linguist and statistician. (See Dkt. No. 8, Ex. 1, Br. of Appellant Delgado on Appeal to SJC 43 n.10.)

Petitioner did not have a reasonable prospect of establishing a prima facie violation of the fair cross section guarantee.  As a result, she denied Petitioner's motion for funds and refused to order the Jury Commissioner to afford Petitioner access to ostensibly public documents.

In reaching this conclusion, the trial judge refused to credit an informal survey of thirty-three Essex County bar advocates, which, according to Petitioner's statistician, tended to show that "Hispanics were consistently underrepresented on jury venires."  (R. App. of Appellant Arriaga on Appeal to SJC 280.)  The trial judge also found that Petitioner could not establish a fair cross section violation claim by examining the surnames of individuals summoned for jury duty since this was an "inherently unreliable" method of satisfying the second prong of the prima facie case.  (Id. at 281.)

Petitioner subsequently filed a motion for reconsideration, arguing that the trial judge's rejection of his preliminary evidence put him in "the Catch-22 position of having to prove his case in order to qualify for assistance in investigating it."  (R. App. of Appellant Delgado on Appeal to SJC 51.)  The trial judge denied the motion on February 22, 1996, and a single Justice of the Massachusetts Court of Appeals upheld this ruling on July 6,

1996.

On April 29, 1996, Arriaga's counsel, acting on behalf of his client and Petitioner, filed a request with the Jury Commissioner under the Massachusetts Freedom of Information Act, Mass. Gen. Laws ch. 66, § 10, seeking Essex County juror attendance records for January through September, 1993. The Jury Commissioner denied this request on May 21, 1996, asserting that the information sought could not be disclosed absent a court order. (R. App. of Appellant Arriaga on Appeal to SJC 249-50.)

On June 5, 1997, Arriaga's counsel made another request for the Jury Commissioner's ch. 234A § 15 lists for Essex County for January through September, 1993. (Id. at 252.) Again, this request was denied.

On July 31, 1997, Petitioner filed an *ex parte* motion for funds to hire Professor Gordon F. Sutton for the purpose of furthering his fair cross section claim. (R. App. of Appellant Delgado on Appeal to SJC 146.) In making this request, Petitioner explained that Professor Sutton had recently used his case as "a teaching vehicle in a course he taught at the University of Massachusetts in applied demographics." (Id. at 147.)

Apparently, those involved in this project had been given access to information concerning Essex County jury

pools from July 1, 1993 to September 17, 1993.  See R. App. of Appellant Arriaga on Appeal to SJC 141; see also R. App. of Appellant Delgado on Appeal to SJC 119 (acknowledging that Professor Sutton's class had access "to some of the jury composition data sought in Appellant's discovery motion").)  Although Arriaga presented the results of this project as part of his motion for a new trial, Petitioner argued that additional funds were necessary because the "data developed by Prof. Sutton in conjunction with the students' efforts was incomplete and needed refinement." (R. App. of Appellant Delgado on Appeal to SJC 148.)

The trial judge denied Petitioner's request for funds on August 1, 1997, and a single Justice of the Appeals Court affirmed this ruling on October 17, 1997.

On September 3, 1998, Arriaga's counsel contacted the Jury Commissioner again and "reminded him that [they] had earlier been in contact concerning juror records maintained by his office, and refreshed his recollection about the nature of [these] discussions by reading him the opinion letter . . . upon which [the Jury Commissioner] had relied in denying prior requests for juror records."  (Dkt. No. 43, Ex. C, Stephenson Aff. ¶ 2.)  Arriaga's attorney then asked the Commissioner

> whether his past refusal to release information . . . was because [counsel] had requested attendance