lists rather than master lists or some other form
of listing.  Citing prospective jurors' rights to
privacy, he stated unequivocally that his office
would under no circumstances release any lists by
which jurors might be individually identified
except upon a court order.

(Id. ¶ 3.)

When the trial court denied Petitioner's motion for a
new trial on September 7, 1999, the SJC consolidated his
appeal of this decision with Petitioner's direct appeal.  On
January 27, 2003, the SJC affirmed Petitioner's conviction
and the denial of his motion for a new trial, as well as
orders by the trial judge denying Petitioner's post-trial
motions for funds and discovery.

F.    Federal Court Proceedings.

Petitioner commenced this action on June 30, 2004.  His
petition for a writ of habeas corpus initially raised five
grounds for relief.  In Ground One, Petitioner alleged a
violation of his Sixth Amendment "right to an impartial jury
representing a fair cross section of the community from
which his jury was selected." (Dkt. No. 1, Pet. for Habeas
Corpus, add. C.)

Ground Two asserted that state court rulings on
Petitioner's discovery motions and requests for financial
assistance violated his constitutional rights to equal
protection, due process, and access to the courts.
Specifically, Petitioner pointed to the failure of state

officials "to require prospective jurors to state their
racial or ethnic identity or otherwise collect the
information needed to determine whether the jury composition
and selection system was actually providing a fair cross
section in the source bodies from which Petitioner's jury
was chosen." (Id.)  Petitioner also argued that he was
improperly denied, as an indigent person, "the information
and financial resources he needed to independently obtain
the information necessary to litigate his federal
constitutional fair cross section claim in his direct appeal
of his conviction." (Id.)  In addition, Petitioner claimed
that the state court overlooked an obligation "to accept
[his] substantial preliminary data as reliable for the
limited purpose of ruling on his motions for the discovery
and financial assistance he needed to fairly litigate his
federal constitutional claim." (Id.)

     In Ground Three, Petitioner maintained that the trial
court failed to give jury instructions which accurately
described elements of the charged offense.

     In Ground Four, he charged that "[t]he prosecution
withheld the actual terms and conditions of Maria Mercado's
cooperation agreement from the defense and made a false and
materially misleading presentation of that agreement to the
jury." (Id.)

-22-

Finally, in Ground Five, Petitioner took the position that his trial counsel rendered constitutionally ineffective assistance in failing to: (I) properly document his fair cross section challenge; (ii) offer timely objections to inappropriate jury instructions; and (iii) request a cautionary instruction concerning Mercado's testimony.

On September 16, 2004, Respondent denied Petitioner's allegations and asserted the following defenses: (1) the state court adjudication did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; (2) the petition contains issues of state law not cognizable of federal <u>habeas</u> review; (3) the petitioner has procedurally defaulted one or more of his claims and the decision of the SJC rests on an adequate and independent state law ground; and (4) the petition fails to state a claim upon which <u>habeas corpus</u> relief can be granted. (Dkt. No. 7, Resp't's Answer 2.) That same day, Respondent filed a supplemental answer containing briefs and decisions from Petitioner's state appeal.[9]

---

[9] Regrettably, the state court appellate briefs submitted by Petitioner and his co-defendant appear to contain a number of notations made by counsel for the Commonwealth. (<u>See, e.g.</u>, Dkt. No. 8, Ex. 4, Br. of Appellant Arriaga on Appeal to SJC 36-41.)  The notations have been ignored.
    In the future, the Commonwealth should take care to include only clean copies of briefs when amassing the state

After the court issued a scheduling order for the filing of dispositive motions, Petitioner sought and obtained several extensions based on his intention to seek financial assistance in retaining Professor Sutton to assist him in the presentation of his fair cross section claim.  On April 6, 2005, Petitioner filed an ex parte motion pursuant to the Criminal Justice Act of 1964, which allows "counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation" to "request them in an ex parte application."  18 U.S.C. § 3006A(e)(1).

In support of this motion, Petitioner acknowledged the possibility that Essex County jury pool records for the year preceding his trial no longer existed.  Assuming such information was unavailable, Petitioner maintained that Professor Sutton's services "were necessary to present to the Court evidence of the nature of the opportunity to prove Petitioner's fair cross section claim lost by the state's refusal to grant Petitioner . . . access to the data, when the data was available."  (Dkt. No. 15, Pet'r's Mem. in Supp. of Ex Parte Mot. for Funds 13.)

When the court allowed this motion on a conditional basis, Respondent filed a motion for reconsideration,

court record.

arguing that any factual development by Petitioner of his fair cross section claim would run afoul of the requirement that a <u>habeas</u> petitioner "inform the state court of both the <u>factual</u> and legal underpinnings of the claim." <u>Scarpa v. DuBois</u>, 38 F.3d 1, 6 (1st Cir. 1994) (emphasis added), <u>cert. denied</u>, 513 U.S. 1129 (1995).[10]

In response, Petitioner moved to strike Respondent's motion on the ground that Respondent lacked standing to intervene in a proceeding under § 3006A(e)(1). <u>See United States v. Abreu</u>, 202 F.3d 386, 390 (1st Cir. 2000) (defining "<u>ex parte</u>" as "[d]one or made at the instance and for the benefit of one party only, and without notice to, or argument by, any person adversely interested" (quoting <u>Black's Law Dictionary</u> 597 (7th ed. 1999))).

In an electronic order dated June 23, 2005, the court denied the motion to reconsider, stating that "Respondent's substantive arguments will be addressed in due course." Petitioner subsequently filed a supplemental memorandum in which he presented two versions of Professor Sutton's project.  The first assumed the existence of Essex County

---

[10]  As the First Circuit has observed, "[t]he fair presentation of facts has generated little ado.  Rather, . . . it is . . . the sufficiency with which the applicant's legal theory was presented . . . which has much bedeviled courts." <u>Nadworny v. Fair</u>, 872 F.2d 1093, 1096 (1st Cir. 1989) (citations omitted).

-25-

jury pool information for the year preceding Petitioner's trial and proposed integrating this data with data previously furnished to the state courts.  The second version of the project assumed the unavailability of additional data and merely contemplated the re-processing of data previously analyzed by Professor Sutton's students.

On August 2, 2005, the court allocated funds to cover the costs of the second version.  The purpose of this ruling was to afford Petitioner the opportunity to refine, rather than expand, the state court record and to give him the chance to establish the impact of the Jury Commissioner's refusal to abide by the clear terms of Section 15 of Chapter 234A.

Nine months later, the court ordered the parties to submit status reports due to the absence of any recorded activity in the case.  In her report, Respondent took the position that "the case could be resolved expeditiously in the same manner as are the vast majority of habeas corpus petitions, i.e., through the filing of memoranda by the parties on all procedural issues and/or the merits pursuant to a Scheduling Order."  (Dkt. No. 20, Resp't's Status Report 2.)

For his part, Petitioner suggested that Respondent be given the opportunity to file a motion to dismiss based only

-26-

on the second and third defenses set forth in her answer.
Following the adjudication of these affirmative defenses,
Petitioner proposed a process whereby he would file motions
for discovery and an evidentiary hearing and the court would
determine whether either was necessary to resolve the merits
of Petitioner's surviving claims.

Petitioner indicated that while his fair cross section
challenge required additional refinement, such work would be
complete by the time the court was ready to address any
claims which survived Respondent's second and third
defenses.  (See Dkt. No. 21, Pet'r's Status Report 3, 4.)
Though the report also conveyed Petitioner's intention to
file, within one week, "a sealed status report" as to the
state of Professor Sutton's work, a review of the docket
reveals that no such report was ever filed.

On June 5, 2006, the court issued a scheduling order
directing Respondent to "file a dispositive motion with
regard to any defense to the petitioner currently available,
with a supporting memorandum, no later than July 7, 2006."
(Dkt. No. 22, Scheduling Order 1 (emphasis added).)  After
receiving several extensions, Respondent filed the pending
motion to dismiss on August 25, 2006.  Petitioner then
sought and obtained two extensions before filing his
opposition on November 7, 2006.

-27-

Following the arguments of counsel on November 16, 2006, the court took the matter under advisement and, in due course, issued the short memorandum and order noted above, allowing Respondent's motion to dismiss.

### IV. DISCUSSION

In his brief opposing Respondent's motion, Petitioner withdrew his claims concerning jury instructions on the element of extreme atrocity or cruelty (Dkt. No. 43, Pet'r's Mem. in Opp'n to Resp't's Mot. to Dismiss 2 n.1), as well as his claim that trial counsel was ineffective in failing to request an instruction directing the jury to view Mercado's testimony with care (id. at 2-3 n.2). During oral argument, Petitioner also conceded that the trial court's instructions relating to malice did not give rise to a viable claim.

In light of these concessions, it is undisputed that Respondent's motion to dismiss should be allowed with respect to Ground Three, and Ground Five now offers an ineffective assistance claim based solely on the failure of trial counsel to fully document the fair cross section challenge he asserted.

Citing the ongoing efforts of his demographer, Petitioner maintains that Claims One, Two, and Five are not ripe for judicial review. For her part, Respondent continues to take the position that Petitioner should not be

-28-

allowed to use Professor Sutton to marshal new evidence in an attempt to show that Commonwealth courts unreasonably applied federal law.

In Vasquez v. Hillery, 474 U.S. 254 (1986), the Supreme Court addressed the issue of whether supplemental evidence, submitted by a California state prisoner at the request of a federal habeas court, had "the effect of undermining the policies of the exhaustion requirement." Id. at 258. In that case, the prisoner sought a reversal of his murder conviction based on the exclusion of African Americans from the Kings County grand jury that indicted him. Id. at 225-56. Recognizing "a need to 'supplement and clarify' the state-court record presented for review," the district court ordered the parties to assess "the mathematical probability that chance or accident could have accounted for the exclusion of blacks from the Kings County grand jury over the years at issue." Id. at 257, 259.[11]

In response to the state's contention that the computer analysis submitted by the prisoner's expert rendered his equal protection claim a "wholly different animal," the Supreme Court held that this "new" evidence "did not fundamentally alter the legal claim already considered by

_____

[11] The district court also directed the parties to file affidavits confirming certain uncontested facts. Vasquez, 474 U.S. at 258-59.

-29-

the state courts." <u>Id.</u> at 259, 260.

Like the supplemental statistical analysis presented in <u>Vasquez</u>, the analysis of Essex County jury pools Petitioner sought to present in this case was based on data already in the state court record. Consequently, it appears unlikely that the introduction of Professor Sutton's analysis would have contravened the exhaustion requirement. <u>Cf.</u> <u>Williams</u> <u>v. Washington</u>, 59 F.3d 673, 677 (7th Cir. 1995) (permitting the introduction of new evidence "which was available to the state courts from other evidentiary sources").

Of course, the court cannot be certain of this conclusion because Professor Sutton's analysis has not been introduced. Indeed, since receiving funds to retain Professor Sutton on August 2, 2005, Petitioner has provided little information as to the status, or preliminary results, of his expert's work.

As noted above, Petitioner never submitted "the sealed status report" he referenced on June 2, 2006; nor did he object to this court's subsequent order directing Respondent to file a dispositive motion based on any of the defenses asserted in her answer. Twice, Petitioner requested (and received) extensions to file his opposition to Respondent's motion to dismiss, but on neither occasion did he mention Professor Sutton.

On November 16, 2006, Petitioner's counsel did report that an illness had delayed Professor Sutton's analysis of the relevant data.  However, in the nine months since oral argument, Petitioner has offered no additional information as to the health of his demographer or the state of his work.

Petitioner has had more than sufficient time to develop and present his analysis of the data relevant to the jury selection process, but none has been provided.  In light of this, the court has no choice but to confine itself to the record as it appeared to the SJC in assessing Petitioner's claims of constitutional error.

A.   <u>Ground One</u>.

The concept of the jury trial in this country now "contemplates a jury drawn from a fair cross section of the community."  <u>United States v. Benjamin</u>, 252 F.3d 1, 12 (1st Cir. 2001) (quoting <u>Taylor v. Louisiana</u>, 419 U.S. 522, 527 (1975)).[12]  As noted above, establishing a <u>prima facie</u> case of a fair cross section violation requires a petitioner to show:

_____

[12] As Judge Gertner has pointed out, "the fair cross-section theory as we understand it cannot be explicitly found in the Constitution" because "[a]t the time of its drafting, juries consisted of white, male, and propertied citizens." <u>United States v. Green</u>, 389 F. Supp. 2d 29, 51 n.40 (D. Mass. 2005), <u>overruled on other grounds by In re United States</u>, 426 F.3d 1 (1st Cir. 2005).

> (1) that the group alleged to be excluded is a
> "distinctive" group in the community; (2) that the
> representation of this group in venires from which
> juries are selected is not fair and reasonable in
> relation to the number of such persons in the
> community; and (3) that this underrepresentation is
> due to systematic exclusion of the group in the
> jury-selection process.

United States v. Gonzalez-Velez, 466 F.3d 27, 39 (1st Cir. 2006) (citing Benjamin, 252 F.3d at 12; Duren, 439 U.S. at 364).

If a petitioner succeeds in setting forth a prima facie case, the government bears the burden of showing "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." Duren, 439 U.S. at 367-68.

In an attempt to demonstrate the inadequate representation of Hispanics in this case,[13] Petitioner "submitted census bureau statistics drawn from the 1990 Federal census stating that 5.5% of the Essex County adult population was Hispanic." Arriaga, 438 Mass. at 563. Petitioner also submitted evidence showing that "the venire from which [his] trial jury was chosen consisted of 345 prospective jurors, of which the stenographer recorded 342

---

[13] The Commonwealth conceded that Hispanics were a "distinctive group" in Essex County. Arriaga, 438 Mass. at 563.

names." Id.[14]

Because "only three surnames of those 342 prospective jurors were listed in the population division of the United States census bureau's Building a Spanish Surname List for the 1990's - A New Approach to an Old Problem," and because "more than two-thirds of Hispanic individuals living in the United States have a surname appearing on that list," Petitioner calculated that "no more than five of the 342 prospective jurors identified by surname, or 1.46 [percent], were Hispanic." Id.[15]

The Arriaga court found this evidence insufficient to satisfy the second Duren element since the disparity between Hispanics in the venire and Hispanics in Essex was not substantial under the "absolute disparity test."[16]    In

---

[14] Among other things, Petitioner and his co-defendant also submitted the undergraduate study supervised by Professor Sutton.

[15] According to the study supervised by Professor Sutton, Hispanics represented a slightly larger percentage of Essex County residents summoned for jury duty between July 1, 1993 and September 17, 1993. (See R. App. of Appellant Arriaga on Appeal to SJC 152, 156.)

[16] The SJC also found that Petitioner was not entitled to use a surname analysis to identify Hispanic jurors.    See Arriaga, 438 Mass. at 563-64 (citing Commonwealth v. Fryar, 425 Mass. 237, 242 (1997); Commonwealth v. Colon, 408 Mass. 419, 438 n.11 (1990); Alen v. State, 596 So.2d 1083, 1093 (Fla. Dist. Ct. App. 1992) (Gersten, J., concurring)). Because this determination is contrary to the Supreme Court's decisions in Hernandez v. Texas, 347 U.S. 475, 480 n.12 (1954) and Castaneda v. Partida, 430 U.S. 482, 486-87 (1977), it cannot serve as a

-33-

reaching this conclusion, the SJC declined Petitioner's request to forgo an absolute disparity analysis and instead apply a "comparative disparity" or "disparity of risk" test. See id. at 565-67.

In United States v. Royal, 174 F.3d 1 (1st Cir. 1999), the First Circuit explained that:

> [a]bsolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group members [i]n the jury [venire]. . . . In contrast, comparative disparity measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service. . . . It is calculated by dividing the absolute disparity percentage by the percentage of the group in the population.

Id. at 6-7 (internal quotation marks and citations omitted).

Disparity of risk, the third method at issue, "describes the increase in a defendant's chance of drawing an underrepresentative petit jury as a result of an underrepresentative jury pool.  It measures the likelihood

---

basis upon which to deny habeas relief.
    In addition, the SJC held that "[t]he single venire brought into the court room for the defendants' trial [wa]s an unacceptably small sample for the purpose of any statistical showing of underrepresentation." 438 Mass. at 564 (citation omitted).  Since the state courts refused to afford Petitioner access to Jury Commissioner records, it would be unfair for this court to penalize Petitioner for the size of the sample he presented.  Cf. United States v. Jackman, 46 F.3d 1240, 1245-48 (2d Cir. 1995) (analyzing underrepresentation of Blacks and Hispanics on appellant's venire under comparable circumstances).

of having at least one [member of a distinctive group] in a
given . . . jury." United States v. Green, 389 F. Supp. 2d
29, 53 (D. Mass. 2005), overruled on other grounds by In re
United States, 426 F.3d 1 (1st Cir. 2005).  Although this
test was proposed by a commentator in 1994, see Peter A.
Detre, Note, A Proposal for Measuring Underrepresentation in
the Composition of the Jury Wheel, 103 Yale L.J. 1913
(1994), it had not been applied in a state or federal case
prior to the Arriaga court's decision.

     As the SJC correctly noted, "the majority of
jurisdictions," including the First Circuit, "apply the
absolute disparity test." Arriaga, 438 Mass. at 565 (citing
Duren, 439 U.S. at 364-366; Castaneda v. Partida, 430 U.S.
482, 495-496 (1977); United States v. Williams, 264 F.3d
561, 568-569 & n.4 (5th Cir. 2001); Royal, 174 F.3d at 6-11;
United States v. Rogers, 73 F.3d 774, 775-777 (8th Cir.
1996); United States v. Sanchez-Lopez, 879 F.2d 541, 547
(9th Cir. 1989)).

     In these jurisdictions, courts generally regard a
disparity below 10% as insubstantial. See, e.g., United
States v. Joost, 94 F.3d 640 (1st Cir. 1996) (table)
(absolute disparity of 7.13% found permissible), cert.
denied, 519 U.S. 974 (1996); United States v. Biaggi, 909
F.2d 662, 678 (2d Cir. 1990) (4.7% absolute disparity found

-35-

permissible), <u>cert. denied</u>, 499 U.S. 904 (1991); <u>United States v. Hawkins</u>, 661 F.2d 436, 442 (5th Cir. 1981) (absolute disparity of 5.45% found permissible), <u>cert. denied</u>, 456 U.S. 991 (1982); <u>United States v. McAnderson</u>, 914 F.2d 934, 941 (7th Cir. 1990) (absolute disparity of 8% found permissible), <u>cert. denied</u>, 513 U.S. 953 (1994); <u>United States v. Clifford</u>, 640 F.2d 150, 155 (8th Cir. 1981) (absolute disparity of 7.2% found permissible); <u>United States v. Suttiswad</u>, 696 F.2d 645, 648-49 (9th Cir. 1982) (absolute disparities of 2.8% for Blacks, 7.7% for Hispanics, and 4.7% for Asians found permissible); <u>United States v. Gault</u>, 141 F.3d 1399, 1402-03 (10th Cir. 1998) (absolute disparity of 7% found permissible), <u>cert. denied</u>, 525 U.S. 910 (1998); <u>United States v. Pepe</u>, 747 F.2d 632, 649 (11th Cir. 1984) (absolute disparity of 7.6% found permissible).

Despite its wide use, the absolute disparity test has been the subject of a great deal of criticism on both "statistical" and "logical grounds." <u>Royal</u>, 174 F.3d at 10.[17] As the SJC itself acknowledged, this mode of analysis

---

[17] In addition, there is good reason to suspect that the "10% rule" is "based on faulty precedent." <u>Green</u>, 389 F. Supp. 2d at 55 n.52. The source of this rule is <u>Swain v. Alabama</u>, 380 U.S. 202 (1965), an equal protection challenge where "[t]he petitioners had to prove <u>purposeful discrimination</u> against blacks in their participation as jurors." <u>Waller v. Butkovich</u>, 593 F. Supp. 942, 954 (M.D.N.C. 1984) (emphasis added).

may "too [readily] tolerate a selection system in which the
seemingly innocuous absence of small numbers of a minority
from an average array creates an unacceptable probability
that the minority members of the jury ultimately selected
will be markedly deficient in number and sometimes totally
missing." <u>Arriaga</u>, 438 Mass. at 566 (quoting <u>Biaggi</u>, 909
F.2d at 678).

A myopic focus on absolute disparity is particularly
dangerous in a case such as this where, because of the small
number of Hispanics in Essex County, even their complete
exclusion would have resulted in an absolute disparity of
less than 10%.[18]  Consequently, some courts ascribe "limited
value" to absolute disparities "when considering small
populations." <u>United States v. Chanthadara</u>, 230 F.3d 1237,
1256 (10th Cir. 2000), <u>cert. denied</u>, 534 U.S. 992 (2001);
<u>see also</u> <u>United States v. Rogers</u>, 73 F.3d 774, 776-77 (8th
Cir. 1996) ("Although utilizing the absolute disparity

---

Because "intentional discrimination . . . is not an
element of a Sixth Amendment fair cross-section challenge,"
<u>Royal</u>, 174 F.3d at 6 n.2, "[w]hether a fair cross section
exists is entirely different from whether intentional
discrimination occurred," <u>Waller</u>, 593 F. Supp. at 954.

[18] It bears noting that the <u>Arriaga</u> court refused to rule
out the possibility that a disparity smaller than 10 percent
could "support a conclusion of unconstitutional
underrepresentation of smaller minority groups, especially when
coupled with persuasive evidence of systematic exclusion." 438
Mass. at 566 ("[W]e do not apply the absolute disparity test
mechanically . . . .").

calculation may seem intuitive, its result understates the systematic representative deficiencies; the percentage disparity can never exceed the percentage of [the distinctive group] in the community."), <u>cert. denied</u>, 517 U.S. 1239 (1996); <u>Jefferson v. Terry</u>, 490 F. Supp. 2d 1261, 1284 (N.D. Ga. 2007).[19]

Of course, the fact that the absolute disparity approach leaves a good deal to be desired does not mean that its use by the SJC constituted an unreasonable application of clearly established federal law.  On the contrary, in applying this test, the SJC acted in accordance with the majority of circuit courts, as well as the <u>Duren</u> Court itself.  <u>See</u> 439 U.S. at 365-66 (finding an absolute disparity of 39% indicative of Sixth Amendment violation).

Petitioner attempts to downplay the significance of the Supreme Court's reliance on absolute disparity in <u>Duren</u> by

---

[19] That being said, applying the comparative disparity mode of analysis in a case involving a small minority population runs the risk of "distort[ing] reality."  <u>United States v. Hafen</u>, 726 F.2d 21, 24 (1st Cir. 1984) (citation omitted).

For example, in an area that had 500,000 whites and only one black eligible to serve as jurors, a random selection system that failed to place the single black on the master wheel would produce a 100 per cent comparative disparity, even though an all-white jury would clearly form a 'fair cross section' of the community.

<u>Id.</u>

pointing out that nothing in the decision can be read as barring <u>any</u> method which might aid a court in determining whether a distinctive group's representation was "fair and reasonable."  While Petitioner is correct in noting that "[n]o methodology has been mandated by the Supreme Court," <u>Green</u>, 389 F. Supp 2d at 54, the absence of clearly established federal law, as determined by the Supreme Court, hardly helps his case.

In light of the SJC's objectively reasonable reliance on the absolute disparity test, the question becomes whether the Commonwealth's highest court was objectively unreasonable in finding an absolute disparity of 4.04% insufficient to satisfy the second <u>Duren</u> element.  As previously noted, numerous circuit courts, including the First Circuit, have found equal or greater disparities incapable of supporting a fair cross section claim. <u>See, e.g.</u>, <u>Joost</u>, 94 F.3d at 640.  This authority confirms that the SJC's approach, whatever Petitioner's expert might say, simply was not unreasonable.  For this reason, the court allowed Respondent's motion to dismiss with respect to Petitioner's fair cross section claim.[20]

---

[20] Given Petitioner's inability to satisfy the second <u>Duren</u> prong, the court need not discuss the SJC's findings with respect to the third <u>Duren</u> element.  <u>See</u> <u>Royal</u>, 174 F.3d at 11 (deciding the case under <u>Duren</u>'s second prong).

-39-

B.    <u>Ground Two</u>.

As noted above, Petitioner asserts that state court violations of his constitutional rights to equal protection, due process, and access to the courts entitle him to <u>habeas</u> relief.  It is well-settled that cases involving the treatment of indigent appellants "reflect both equal protection and due process concerns." <u>M.L.B. v. S.L.J.</u>, 519 U.S. 102, 120 (1996) (citation omitted); <u>see also</u> <u>Lewis v. Casey</u>, 518 U.S. 343, 367 (1996) (Thomas, J., concurring) (noting that the right of access to the courts has been described as "a 'consequence' of due process, . . . an 'aspect' of equal protection, . . . or as an 'equal protection guarantee'" (citations omitted)).[21]

Generally, courts "analyze the fairness of relations between the criminal defendant and the State under the Due Process Clause" and address "the question whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause." <u>Bearden v. Georgia</u>, 461 U.S. 660, 665 (1983) (citation omitted).  "[A]s a practical matter," however, "the two clauses largely converge." <u>Smith v.</u>

---

[21] The Supreme Court has also "grounded the right of access to courts in the Article IV Privileges and Immunities Clause" and "the First Amendment Petition Clause." <u>Christopher v. Harbury</u>, 536 U.S. 403, 415 n.12 (2002) (citations omitted).

-40-