Robbins, 528 U.S. 259, 276 (2000) (citation omitted).

While neither provision requires states to provide appellate review, see Ross v. Moffitt, 417 U.S. 600, 606 (1974) (citing McKane v. Durston, 153 U.S. 684, 687 (1894)), the decision to make such review available triggers an obligation to furnish procedures which "offer each defendant a fair opportunity to obtain an adjudication on the merits of his appeal," Evitts v. Lucey, 469 U.S. 387, 405 (1985) (discussing Griffin v. Illinois, 351 U.S. 12 (1956), and Douglas v. California, 372 U.S. 353 (1963)).

To implement this principle of fundamental fairness, the Supreme Court has "focused on identifying the basic tools of an adequate defense or appeal, and . . . ha[s] required that such tools be provided to those defendants who cannot afford to pay for them."  Ake v. Oklahoma, 470 U.S. 68, 77 (1985) (internal quotation marks and citation omitted).

Petitioner contends that the SJC denied him one such tool by failing to collect data recording the racial or ethnic identity of prospective jurors.  In support of this argument, he points to the Arriaga court's concession that asking potential jurors to "voluntarily . . . disclose their racial and ethnic background in the juror confirmation form" had not produced the information necessary to "assess the issue of underrepresentation." 438 Mass. at 571.  According

to Petitioner, by subsequently ordering the Jury Commissioner to adopt the approach taken by federal courts, see 28 U.S.C. § 1869(h) (requiring prospective jurors to identify themselves by race in order "to enforce nondiscrimination in jury selection),[22] the SJC essentially acknowledged a deprivation of his right to due process.

The problem with this contention stems from the lack of any Supreme Court case law suggesting that state officials have an obligation under the Fourteenth Amendment to the United States Constitution to collect or record the racial and ethnic makeup of the source bodies from which petit juries are drawn.  Given the absence of any such authority, the SJC's efforts to address a perceived "gap in the court's own gathering of information," id. at 572, cannot serve as a basis upon which to grant habeas relief.

Petitioner next contends that the state courts ignored their constitutional obligation to provide him with funds to hire an expert.  Because Petitioner requested financial assistance in connection with his motion for a new trial and indigent defendants in Massachusetts are only entitled to "extra fees" when pursuing an "appeal," see Mass. Gen. Laws

---

[22] Like the United States District Court for the District of Massachusetts, the Commonwealth now requires prospective jurors to identify themselves by ethnicity, as well as race. See Arriaga, 438 Mass. at 572.

ch. 261, § 27C(4), Respondent asserts that the trial judge and SJC correctly applied state law in refusing to provide Petitioner funds to hire Professor Sutton.[23]

Assuming *arguendo* that the timing of Petitioner's motion for a new trial rendered it the functional equivalent of a first tier appeal, this is not one of those rare instances where "a state court's error in applying a state rule . . . ha[s] constitutional implications." Sanna v. Dipaolo, 265 F.3d 1, 12 (1st Cir. 2001) (citation omitted).

Pursuant to AEDPA, Petitioner must demonstrate that the state courts' refusal to pay for a demographer was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. While the principle of "equal justice" first set forth in Griffin has been applied in an assortment of contexts, see, e.g., Douglas, 372 U.S. at 357-58 (requiring appointment of counsel for first appeal as of right); Smith v. Bennett, 365 U.S. 708, 713-14 (1961) (ruling that state must waive filing fee for indigent habeas applicants),[24] the Supreme Court has

---

[23] After the trial judge denied Petitioner's motion for a new trial, "the SJC amended Mass. R. Crim. P. 30(c)(5) to authorize the allowance of costs associated with new trial motions." Murphy v. Dennehy, No. 05-12246-DPW, 2007 WL 430754, at *6 (D. Mass. Feb. 5, 2007).

[24] Griffin itself invalidated a state practice of limiting appellate review to persons able to afford a trial transcript. See 351 U.S. at 18-19

never required a state to provide non-psychiatric expert assistance to a defendant pursuing an appeal.[25]

On the contrary, the Court has proclaimed consistently that

> The duty of the State . . . is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process.

Coleman v. Thompson, 501 U.S. 722, 756 (1991) (quoting Ross, 417 U.S. at 616).  Accordingly, the court must conclude that the Commonwealth had no Fourteenth Amendment obligation to pay for the services of Professor Sutton or to accept Petitioner's preliminary data as reliable for the purpose of ruling on his post-trial motions for funds.

The state courts' denial of Petitioner's discovery requests presents another story.  While the SJC found that Mass. Gen. Laws chapter 234A, §§ 10, 15 provided Petitioner with "access to basic information from which [he] could proceed to discover the ethnic identity of the prospective jurors," Arriaga, 438 Mass. at 572, Petitioner has rebutted

---

[25] Recently, the Supreme Court held that a state prisoner facing a death sentence who had "made a substantial showing of incompetency" was entitled to "adequate means by which to submit expert psychiatric evidence in response to the evidence that had been solicited by the state court."   Panetti v. Quarterman, 127 S.Ct. 2842, 2855 (2007).

-44-

this factual determination with clear and convincing evidence that the Jury Commissioner refused to recognize his statutory right to the names of prospective Essex County jurors.

Under the circumstances, Petitioner asserts that this information constituted the only tool with which he could construct a viable fair cross section challenge. See Lewis, 518 U.S. at 355 ("The tools [which must] be provided are those that the inmates need in order to attack their sentences, directly or collaterally . . . ." (citing Bounds v. Smith, 430 U.S. 817 (1977))).

In order to prove that the denial of access to this data violated his right of meaningful access to the courts, Petitioner must demonstrate "actual injury," which the Supreme Court has defined as "a nonfrivolous legal claim [being] frustrated or . . . impeded." Id. at 349, 353; see also Boivin v. Black, 225 F.3d 36, 43 n.2 (1st Cir. 2000).

While the Jury Commissioner's refusal to recognize Petitioner's rights under Chapter 234A clearly hampered the effort to "produce reliable data concerning [the] 'ordinary and regular composition of jury venires in Essex County,'" Arriaga, 438 Mass. at 564 (quoting Commonwealth v. Tolentino, 422 Mass. 515, 520 (1996)), there is no evidence that the production of such data would have entitled

Petitioner to any relief.

Conspicuously absent from the record is any expert or other report describing the nature of the opportunity Petitioner lost when he was denied access to the relevant data. Without any such evidence, the court cannot presume that this opportunity was significant, since the SJC's objectively reasonable application of the "ten percent" rule all but foreclosed a fair cross section claim. Indeed, because Hispanics comprised only 5.5 percent of Essex County's adult population, it was mathematically impossible for Petitioner to prove that there were 10 percent more Hispanics residing in Essex County than there were on Essex County jury pools.

It is now clear that Petitioner's only hope of establishing a Sixth Amendment violation rested on convincing the SJC to abandon absolute disparity in favor of another analytical approach or producing persuasive evidence of systematic exclusion. In light of his inability to do either, the state courts' denial of Petitioner's discovery requests did not result in any cognizable harm.

As the Supreme Court has observed, the right of meaningful access to the courts does not exist in a vacuum but "is ancillary to the underlying claim." Christopher v. Harbury, 536 U.S. 403, 415 (2002) (footnote omitted).

Hence, notwithstanding clear and convincing evidence that Petitioner was denied access to data intended to "insure the integrity of the juror selection process," Mass. Gen. Laws ch. 234A, § 15, Petitioner suffered no injury "by being shut out of court," Christopher, 536 U.S. at 415.

C.   Ground Four.

Petitioner contends that the extremely generous disposition Mercado received in spite of her false testimony in the Morales trial is proof of a cooperation agreement with the Commonwealth that did not require her to testify truthfully.  Because the Commonwealth failed to disclose this arrangement -- and in fact informed Petitioner's jury that it would only consider Mercado's "truthful testimony . . . in resolving the charge pending against her" -- Petitioner maintains that he is entitled to habeas relief under Kyles v. Whitley, 514 U.S. 419 (1995) and Giglio v. United States, 405 U.S. 150 (1972).

"[I]f such an agreement did exist," there is no question that the Commonwealth "would have been obligated to disclose it."  United States v. Tse, 375 F.3d 148, 165 (1st Cir. 2004) (citing Giglio, 405 U.S. at 154-55).[26]  The only issue,

---

[26] Respondent also appears to concede that the Commonwealth's failure to disclose a secret agreement with Mercado permitting her to commit perjury with impunity would have led to "a verdict [un]worthy of confidence."  United States v. Gonzalez-Gonzalez, 258 F.3d 16, 22 (1st Cir. 2001)

then, is whether Commonwealth courts overlooked clear and convincing evidence of a clandestine agreement that would have violated both state and federal law, as well as the rules of professional responsibility.

Petitioner posits that Mercado's false testimony during the Morales trial was a product of "the prosecutor's accepting response to Ms. Mercado's repeated, uncorrected false testimony in [Petitioner's] trial that she had no agreement with the Commonwealth in exchange for her testimony, no arrangement to plead guilty and no expectation of sentencing leniency." (Pet'r's Mem. in Opp'n to Resp't's Mot. to Dismiss 48.) This argument is tenuous at best. It is more likely that the strain of testifying against individuals who had threatened to harm her children caused Mercado to fall apart during the Morales trial.

The fact that she received a lenient sentence despite testifying inconsistently in the two trials does not mean that the Commonwealth misrepresented its understanding with her. As previously noted, the terms of the agreement presented to Petitioner's jury required the Commonwealth to take Mercado's "cooperation, including her truthful testimony, into consideration in resolving the charge

---

(citing Strickler v. Greene, 527 U.S. 263, 298 (1999) (Souter, J., concurring in part and dissenting in part)).

pending against her." Although Petitioner contends that Mercado's cooperation was limited to the testimony she offered in the two trials, the record reflects that Mercado provided the Commonwealth with letters written by Petitioner and his co-defendant, which the trial judge deemed strong evidence of an orchestrated attempt to intimidate witnesses and influence their testimony.

This consciousness of guilt evidence not only bolstered the Commonwealth's case, it demonstrated a well-founded fear of reprisal which Mercado had to overcome in deciding to cooperate. Ample support exists for the inference that the Commonwealth considered the full extent of Mercado's cooperation, as well the risks associated with it, in recommending a sentence of time served.[27]

In sum, because the evidence of an undisclosed agreement between the Commonwealth and Mercado is neither clear nor convincing, the court allowed Respondent's motion to dismiss with respect to Ground Four.

D.  **Ground Five**.

Petitioner asserts that his trial attorney rendered constitutionally ineffective assistance in failing to

---

[27] In contrast, it would be untenable to conclude that the Commonwealth had an undisclosed agreement to reward Mercado based on the results of the trials in question, since her testimony did not lead to the outcome the Commonwealth desired in the Morales case.

properly document a fair cross section challenge or request funds to fully investigate the claim. In response to this claim, the SJC stated:

> [T]he defendants each argue that their respective counsel rendered ineffective assistance in failing to preserve error and to pursue and develop the motions to dismiss the venire. Little is offered by either defendant to support these contentions. As discussed above, there is no basis for us to conclude that the claimed underrepresentation of Hispanics was substantial or resulted from systematic exclusion in the jury selection process. The defendants have not demonstrated that trial counsel erred in failing to pursue the motions to dismiss the venire and have not demonstrated a substantial likelihood of a miscarriage of justice.

Arriaga, 438 Mass. at 583.

To prove a violation of the right to effective assistance of counsel a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," and that "the deficient performance prejudiced his defense." Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007) (quoting Strickland v. Washington, 466 U.S. 668, 687-88 (1984)).

"Under the first prong of Strickland, there is a strong presumption that counsel's strategy and tactics fall within the range of reasonable professional assistance . . . ." Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (internal quotation marks and citation omitted). To satisfy the second Strickland prong, a petitioner must show that "there

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Dugas v. Coplan, 428 F.3d 317, 334 (1st Cir. 2005) (defining "reasonable probability" as "a probability sufficient to undermine confidence in the outcome" (citation omitted)).

Given that any argument regarding underrepresentation of Hispanics in the jury venire would have been futile under the well supported view of the law taken by the SJC, Petitioner's claim of ineffective assistance of counsel on this ground is plainly flawed.

## V. CONCLUSION

For the reasons set forth above, the court allowed Respondent's motion to dismiss on March 19, 2007. The clerk is ordered to enter judgment for Respondent. This case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge